Isaac Duane WHITE, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–94–351–CR.

Court of Appeals of Texas, Corpus Christi.

Oct. 10, 1996.

---

**46.** *Id.*

W. Clayton Cain, Victoria, for appellant.

George J. Filley, III, District Attorney, Loretta Owen, Assistant District Attorney, Cynthia T. Sheppard, Houston, Marek & Griffin, Victoria, for State.

## OPINION ON MOTION FOR REHEARING

RODRIGUEZ, Justice.

A jury found appellant guilty of murder and assessed his punishment at forty years confinement and a $10,000.00 fine. On February 29, 1996, a panel of this court reversed appellant's conviction. On March 18, 1996, the State asked that the court withdraw the panel's opinion and consider this case *en banc*. On April 4, 1996, this Court granted the State's motion, and on June 5, 1996, this case was argued and submitted to the Court *en banc*. We now affirm the trial court's judgment.

On January 26, 1993, Lauren Chappel was found dead inside her place of employment, the Cabaret Club in Victoria, Texas. She had been shot, and it was determined that a money bag was missing. The police suspected that appellant was involved in the murder, but it was not believed that the physical evidence was sufficient for them to obtain an arrest warrant. A gun was recovered from appellant's home, but ballistic tests were unable to match test bullets from the gun to projectiles recovered from Chappel's body. A money bag was also recovered, but it was not established that it came from the Cabaret Club. Clothing appellant allegedly wore on the day of the offense did not reveal gunshot residue. Five rolls of quarters were also recovered. It had been determined that several rolls of quarters had been in the Cabaret Club's money bag when it was taken; and appellant used rolls of quarters to buy cocaine immediately after the offense occurred. Appellant's fingerprints were found on the coin wrappers, but the victim's prints were not. A bank teller could not identify them as being the same rolls of quarters she had given to the victim. Accordingly, the physical evidence did not link appellant to the crime. Despite the lack of incriminating evidence, the District Attorney interrogated appellant and was able to convince appellant to confess to the offense.

In point of error one, appellant alleges that the trial court erred by admitting the confession into evidence. The trial court, after a pre-trial suppression hearing, overruled appellant's motion to suppress the confession and made findings of fact and conclusions of law. Appellant did not testify at the suppression hearing.

The record shows that on the day after the offense occurred, appellant voluntarily accompanied two police officers to the police department for questioning. Although not in custody, appellant was admonished of his rights before the interview began and again when the interview concluded. He was not arrested and was allowed to leave. Two days later, January 29, 1993, appellant voluntarily returned to the police station where he was again given *Miranda* [2] warnings before speaking with an investigator and George Filley, III, the criminal district attorney. After being interviewed twice on this day, he was not arrested and was allowed to leave after giving the detective a written statement.

On February 1, 1993, in response to a subpoena, appellant appeared before the grand jury and was informed of his rights before testifying. He was not indicted at that time. On February 10, 1993, the criminal district attorney requested a meeting with appellant. But, because appellant arrived around closing time, the interview was rescheduled for the following day. When appellant arrived on February 11, 1993, he was taken to the courthouse basement where the grand jury room, complete with video

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

equipment, was located.[3] The criminal district attorney testified at the suppression hearing that it was his intention to videotape the interview. Appellant, however, was neither informed of the videotaping nor of his *Miranda* rights as had been done prior to the previous interrogations.

During the videotaped interview, the criminal district attorney was the lone interrogator. Filley's first statement to appellant was that "[t]he Grand Jury investigation clearly shows that you are the person that's responsible for Lauren's death." He also informed him that the grand jury was coming back into session. The following then took place:

> Filley: ... And you're not—You're not under arrest.
>
> White: No? I'm—
>
> Filley: You're not going to be arrested *right now*. When we're finished talking today, you're going to be free to go home.

Filley then proceeded to describe to appellant the two types of persons who commit these types of offenses. He described the first as being a cold, uncaring, calculated type of killer who normally pre-planned the crime. Filley described the second type of killer as a person who had a good upbringing, good education, and with a good chance in life. Somewhere along the way, Filley continued, this second type of person encounters problems associated with drugs or alcohol and ends up doing things he would not ordinarily do in order to support his habits. This is a person with feelings who later is remorseful over the wrong things he does. Filley then told appellant he did not think he was the first type. Appellant agreed he was the second type of person. However, when appellant denied shooting Lauren Chappel, Filley told appellant that was not a question anymore, because the investigation showed that appellant was "the person responsible for Lauren's death." When Filley began asking appellant why he had shot Lauren Chappel, the following then took place:

**3.** The video recording equipment was permanently mounted in the grand jury room.

**4.** The word "you" is not part of the video tape transcription included with the record. After

> White: That's a tough question to answer, sir. *I can't—To acknowledge that question would be, more or less, to openly admit to that."*
>
> Filley: That's not a question. I know what you're saying—
>
> White: It's just that—
>
> Filley: But that's not a question any more.
>
> White: See—(Inaudible)
>
> Filley: You need to—You need to—You need to listen to me, because this is important. This—This is the chance for the why of it, not down the road....

Filley continued to pressure appellant into admitting he had shot Lauren Chappel, the victim, by telling him that those words had to come from him and that the grand jury needed to know "the why" of it. Appellant then began telling Filley that he had gone to the victim's club because Chappel needed a D.J. that night. Appellant also admitted smoking some crack on the way to the club and that he had taken a revolver from a friend named Troy who had stolen it from another acquaintance. He stated that the side door to the club was unlocked and he went in. Chappel was sitting at the bar eating when he went in and he saw a bank money bag on the counter as well as some books and her purse. The following then took place:

> Filley: All right. And—
>
> White: I'm sorry. Uhh—Oh God—*I don't under—I'm not sure if I'm supposed to be talking to—*(you)[4]
>
> Filley: Let me—Let me—Let me ask you this.

The questioning continued. Appellant stated that his gun fell out when he reached for and took the money bag. The following then took place:

> Filley: When you picked up that gun and you saw that she was scared and turned around because you had the bag, what did you do?
>
> White: Panicked.

listening to the tape, the Justices were not all in agreement that the word "you" was actually said.

Filley: You panicked. And that's when you fired, wasn't it, when you panicked?

White: *Can I not answer that one? I mean—I mean—I mean—*

Filley: Isaac—

White: *It's—That's—*

Filley: What I'm saying to you is—

White: *Well, but I don't—*

Filley: This is the time to tell me.

White: I don't want to say I fired, but—

Filley: That's not a question, son. The question is, why you fired. You fired the gun. Isaac, did you fire the gun?

White: *-I can't answer that, sir.*

Filley continued the questioning. Appellant finally admitted the shooting. He then began describing the events leading to the murder. Towards the end of the interrogation, appellant exclaimed: *"Damn. Under advice of counsel, I for—I wasn't really supposed to talk."* [5] Once appellant made this exclamation, Filley offered to terminate the interrogation if appellant desired to do so. Again, Filley told appellant that he was not under arrest and was free to go. Filley added that if appellant wanted to consult with his lawyer, he had no objections and would terminate the interview. However, Filley resumed the interrogation before obtaining an answer from appellant in an effort to try to determine the whereabouts of the murder weapon and the stolen money.

At the end of the interrogation, Filley asked appellant to give a brief written statement to his investigator "setting out the why" and stated *"then you can go home."* Appellant asked Filley if he could consult with his attorney before signing the statement, and Filley indicated that he could. Appellant was then taken home by Filley's investigator.[6] Appellant was indicted and arrested the following day.

Following the suppression hearing, the trial court, among other findings, found that:

10.) At no time was Isaac Duane White told he was under arrest, nor was he restrained at the interview, or prevented from leaving the interview. Isaac Duane White freely and voluntarily consented to the interview with George J. Filley, III....

11.) Isaac Duane White was not in custody before, during or after the interview with George J. Filley, III on February 11, 1993.

12.) Isaac Duane White left the Criminal District Attorney's office after the interview....

13.) The interview ... was not the product of a custodial interrogation;

14.) The requirements of Article 38.22, Section 3, Texas Code of Criminal Procedure were not required.

The trial court concluded that the videotaped interview of the appellant was freely, knowingly, and voluntarily given. At suppression hearings, the trial court is the trier of fact and the exclusive judge of the witnesses' credibility and the weight to be given their testimony. *Nance v. State*, 807 S.W.2d 855, 866 (Tex.App.—Corpus Christi 1991, pet. ref'd). In determining the voluntariness of the statement, the trial court considers the totality of the circumstances, *Gonzales v. State*, 807 S.W.2d 830, 832–33 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd), and the trial court's findings should not be disturbed absent a clear abuse of discretion. *Meek v. State*, 790 S.W.2d 618, 620 (Tex. Crim.App.1990).

Article 38.22(3)(a) of the Code of Criminal Procedure provides that

no oral ... statement of an accused made as a result of custodial interrogation shall be admissible against the accused ... unless: (1) an electronic recording, which may include ... videotape, ... is made of the statement; [and] (2) prior to the statement but during the recording[,] the accused is given the warning in Subsection

---

**5.** After appellant was initially questioned by the police, an attorney apparently advised him that he "shouldn't answer any more questions."

**6.** At the suppression hearing, Filley testified he had allowed appellant to go home because he had given appellant his word that he would be allowed to leave after the interview and he did not present an escape risk. He added that the decision had been made "tactically" because appellant had not been in custody.

(a) of Section 2[7]... and the accused knowingly, intelligently and voluntarily waives any rights set out in the warning. Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a)(1) (Vernon Supp.1996).

▓ The determinative issue in this case is whether appellant was or became the subject of a custodial interrogation so as to require that he be read the warnings required by *Miranda* or set out in article 38.22 § (2). The State's position is that neither *Miranda* nor article 38.22 § (2) rights were read to appellant because he was not under arrest and, therefore, not in custody. It is not necessary, however, that an accused be under formal arrest for *Miranda* rights to arise. *Ruth v. State,* 645 S.W.2d 432, 435 (Tex.Crim.App.1979). Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or is otherwise deprived of his freedom of action in any significant way. *Id.* The obligation to administer warnings attaches only where there has been such a restriction on a person's freedom as to render him "in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam).

▓ Whether an interrogation is custodial is determined by numerous factors, depending on the circumstances of the case. *Ruth,* 645 S.W.2d at 435. Factors to be considered are: 1) focus of the investigation; 2) subjective intent of the police; 3) probable cause to arrest; and 4) subjective intent of the accused.[8] *Id.* at 435; *Ancira v. State,* 516 S.W.2d 924, 926–27 (Tex.Crim.App.1974). Factors one and two, however, *if undisclosed to the individual,* do not bear upon the question of whether the individual is in custody for purposes of *Miranda. Stansbury v. California,* 511 U.S. 318, ————, 114 S.Ct. 1526, 1529–30, 128 L.Ed.2d 293 (1994).

Thus, if the interrogator's knowledge or beliefs concerning the potential culpability of the person being questioned are conveyed to him during questioning, by word or deed, they may bear on the custody issue if they would affect how a reasonable person in that position would perceive his freedom to leave. *Id.*

▓ The Supreme Court recently described the process of determining whether an interrogation was custodial as follows:

Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

▓ In the present case, the first inquiry described in *Thompson* is readily answered since the interrogation was videotaped and the events leading to the interrogation are virtually undisputed. Accordingly, we focus on the second inquiry.

With respect to the four factors considered in *Ruth,* the Supreme Court has emphasized that the interrogator's intent and whether the defendant is the focus of the investigation are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of

---

7. The warnings in Section 2 include:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
(2) any statement he makes may be used as evidence against him in court;
(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
(5) he has the right to terminate the interview at any time.

Tex.Code Crim. Proc. Ann. art. 38.22, § 2 (Vernon 1979).

8. We note that the four-pronged test has been questioned. *Lee v. State,* 893 S.W.2d 80, 85 n. 2 (Tex.App.—El Paso 1994, no pet.).

action. *Stansbury*, 511 U.S. at ——, 114 S.Ct. at 1529 (1994).

█ In the present case, appellant spoke to the police, the district attorney, and the grand jury on several occasions before he confessed. Each time, appellant was permitted to leave. Appellant voluntarily came to the courthouse the day before he confessed, at his leisure and at his chosen time, and was permitted to leave. On the day he confessed, he returned at his leisure. At the beginning of the videotaped session, appellant was told (falsely) that the grand jury was ready to indict him. But, he was also told, less than a minute into the interview, that he was not under arrest and would be free to go home.[9] Appellant was not handcuffed nor physically restrained in any manner. Although Filley encouraged appellant to relate his reason for committing the offense, Filley made no threats or promises to gain the confession.

Appellant initially denied committing the offense and appeared reluctant to confess. Filley, of course, persuaded appellant to reveal specific details of the offense about fifteen minutes after the interview began. But, Filley never physically prevented appellant from leaving the room or from terminating the interview, and never orally instructed appellant that he could not leave. Appellant left the office at the conclusion of the interrogation.

The present case is similar to *Mathiason*, 429 U.S. 492, 97 S.Ct. 711. Mathiason was called to the police station by an officer investigating a burglary. The Supreme Court described the facts as follows:

The officer met defendant in the hallway, shook hands and took him into an office. The defendant was told he was not under arrest. The door was closed. The two sat across a desk. The police radio in another room could be heard. The officer told defendant he wanted to talk to him about a burglary and that his truthfulness would possibly be considered by the district attorney or judge. The officer fur-

ther advised that the police believed defendant was involved in the burglary and [falsely stated that] defendant's fingerprints were found at the scene. The defendant sat for a few minutes and then said he had taken the property. This occurred within five minutes after defendant had come to the office. The officer then advised defendant of his *Miranda* rights and took a taped confession.

*Mathiason*, 429 U.S. at 493–94, 97 S.Ct. at 713.

The Supreme Court found it, "clear from these facts that Mathiason was not in custody or 'otherwise deprived of his freedom of action in any significant way.' " *Id.* at 495, 97 S.Ct. at 714; *see also California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

Giving due deference to the trial court's determination of the historical facts, we do not find that the trial court erred in determining that appellant was not in custody when the statement was recorded. Point one is overruled.

Nonetheless, we believe that the District Attorney's conduct borders on the improper. Judge Clinton's words in *McCrory v. State*, 643 S.W.2d 725, 734 n. 16 (Tex.Crim.App. 1983) are illuminating:

A careful review of *Miranda* reminds us that its genesis was the Court's "concern for the atmosphere of custodial interrogation of criminal suspects, in which no overt physical coercion nor patent psychological ploys have been applied." *Faulder v. State*, 611 S.W.2d 630, 638 (Tex.Cr.App. 1979), cert. denied 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1980). Citing "psychologically oriented" interrogation, which is characterized by isolation, the assumption of guilt, minimization of the moral seriousness of the offense, blaming the victim or society, persistence, domination, alteration of interrogators who are respectively hostile then friendly, and, if all else fails, trickery, the Supreme Court observed the

---

9. Being the focus of a criminal investigation does not equate to being in custody, *Beckwith v. United States*, 425 U.S. 341, 345, 96 S.Ct. 1612, 1615, 48 L.Ed.2d 1 (1976), and the mere fact that an investigation has focused on a suspect does not

trigger the need for *Miranda* warnings in noncustodial settings. *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984).

intent of this "modern practice" is to dissuade the exercise of the rights to silence and counsel. Reasoning that "incommunicado interrogation" is at odds guaranteed by the Fifth Amendment, unless adequate protective devices are employed to dispel "the compulsion inherent in custodial surroundings," the Court felt compelled to hold:

> "In order to combat [pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."

384 U.S. at 467, 86 S.Ct. at 1624.

█ In point two, appellant claims the evidence is insufficient to support his conviction. In reviewing a sufficiency challenge, the appellate court must review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 157 (Tex.Crim. App.1991); *Villarreal v. State*, 865 S.W.2d 501, 503 (Tex.App.—Corpus Christi 1993, pet. ref'd). The facts stated above, in conjunction with appellant's confession, provide sufficient evidence to support the conviction. Point two is overruled.

The judgment of the trial court is affirmed.

Dissenting opinion by CHAVEZ, J., joined by YANEZ, J.

CHAVEZ, Justice, dissenting.

I respectfully dissent.

The day following the discovery of Lauren Chapel's murder, appellant was taken to the police department by two detectives for questioning. Although ostensibly not in custody at that time, the officers read appellant his *Miranda*[1] warnings before questioning him,

and again when the questioning concluded. Two days later he returned to the police station at the officers' request and was again read his *Miranda* warnings before being questioned by the police and the district attorney. After being questioned on two separate occasions that day, he gave a statement and was allowed to leave. Three days later he appeared before the grand jury in response to a subpoena. Before testifying in front of the grand jury, he was read his *Miranda* warnings. The record reflects that the district attorney did not ask the grand jury to vote on an indictment on that occasion. Accordingly, no indictment was returned. Immediately after the hearing, the investigator asked the district attorney what else he needed for an indictment, and the district attorney replied that he needed an eyewitness account or a confession from appellant.

Accordingly, ten days later, the investigator called appellant and told him that Mr. Filley, the district attorney, wanted to talk to him at the courthouse. Appellant agreed to go, but since he showed up at the courthouse around closing time, an appointment was made for the following day. The next day the investigator called appellant when he failed to appear for the scheduled appointment. Appellant stated he had overslept, but agreed to go see Filley as soon as he got ready, which he did. It was at this meeting where Filley would seek to obtain the confession that he wanted. To accomplish this, Filley decided to video tape his interrogation of appellant, without informing him of his plans. It is curious that at all of his previous non-custodial interrogations, appellant was read his *Miranda* rights before being questioned, yet at this most critical time when the admitted purpose of the meeting was to obtain a confession, the district attorney intentionally decided not to inform appellant that his *Miranda* rights were still available to him.

The investigator admitted at the suppression hearing that appellant was the prime suspect from day one. Accordingly, the focus of the investigation centered upon him

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

from the beginning. Admittedly, Filley informed appellant at the beginning of the interrogation that he would not be arrested *right now* and that he would be allowed to go home after the questioning. Filley testified at the suppression hearing that allowing White to leave after the interrogation was a tactical decision, and at any rate, White did not present an escape risk. These were the circumstances that existed before the video tape interrogation of White began.

Admission of the video tape confession depends on whether the circumstances surrounding White's interrogation were such that he became the subject of a custodial interrogation so as to require that he be read the warnings required by *Miranda* or article 38.22 § (2). TEX.CODE CRIM. PROC. ANN. art. 38.22 § 2 (Vernon 1979). White was not formally arrested after his arrival for the meeting. However, a person need not be under formal arrest in order to be custody. *Melton v. State,* 790 S.W.2d 322, 325 (Tex. Crim.App.1990). In Texas, the four factors that will determine whether a person is the subject of a custodial interrogation are the following: 1) focus of the investigation; 2) subjective intent of the police; 3) probable cause to arrest; and 4) subjective intent of the accused. *Id., Ruth v. State,* 645 S.W.2d 432, 435 (Tex.Crim.App.1979).[2] The initial determination of custody, however, depends on the objective circumstances of the interrogation. *Stansbury v. California,* 511 U.S. 318, ——, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). In the instant case, it is undisputed that the state's objective was to obtain a confession from appellant.

Factors one and two, where disclosed to the individual being questioned, are only relevant to the extent they would affect how a reasonable person in that position would gauge the breadth of his or her "freedom of action". *Stansbury,* 511 U.S. at ——, 114 S.Ct., at 1530. Communication is crucial because this is the only manner in which a suspect can understand his situation. *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). In

the instant case, White was immediately told that the grand jury investigation clearly showed that he had committed the crime, and that the only remaining question before an indictment could be returned was an explanation of why he had committed the offense. Although told he would not be arrested then, he was told that he would be indicted. The record shows that when White would not admit to shooting Ms. Chappel, and stated he did not wish to answer certain questions, Filley told White that was not a question anymore and persisted with his questioning. When Filley completed his interrogation, he told White he could give his investigator a statement, *"then you can go home."*

The record also shows that White believed that he was in custody whenever he was being questioned by the police. When Filley told White that he was not under arrest, White seemed incredulous and replied, "No?" Filley asked White when had he consulted with an attorney, White's reply was, ". . . You know, *when I first got in custody."* After disclosing to Filley that he had consulted with an attorney, White believed Filley had gotten mad and told Filley: "I don't want you to get mad though"; "I don't want you to throw me in jail". Obviously, White believed that he was in custody, especially when Filley isolated him in the basement of the courthouse for purposes of extracting the confession.

Filley's and the investigator's testimony at the suppression hearing shows that the interrogation was for one purpose and one purpose only: to obtain a confession from appellant. In effect, that purpose was indirectly communicated to White. He was told that the investigation clearly showed he had committed the offense and that he would be indicted, except that he would not be arrested *right now.* On numerous occasions when he sought not to answer the most incriminating questions, Filley ignored him and insisted that he had to tell "why" he had committed the offense. Under those circumstances, a reasonable person would have felt that he was not at liberty to terminate the interroga-

---

2. While the majority notes that this test has been questioned, *see Lee v. State,* 893 S.W.2d 80, 85 n. 2 (Tex.App.—El Paso 1994, no writ); nevertheless, it is still the precedent we must be guided by.

tion and leave. This answers the second inquiry under *Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

Given these circumstances, I would hold under *Melton* and *Thompson v. Keohane,* that the video tape confession was the product of a custodial interrogation which required the reading of *Miranda* rights to appellant, without which, the confession could not have been freely, knowingly nor voluntarily given.

Accordingly, I would hold that the trial court erred in admitting the confession, reverse the conviction and remand the case to the trial court for re-trial.

YANEZ, J., joins the dissent.