**Veronica Patricia ZAVALA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–95–490–CR.**

Court of Appeals of Texas,
Corpus Christi.

Nov. 6, 1997.

Rehearing Overruled Nov. 6, 1997.

Rene B. Gonzalez, Brownsville, for Appellant.

Robert H. Moore, Jr., Asst. County (Crim. Dist.) Attorney, Yolanda De Leon, District Attorney, Brownsville, for State.

Before FEDERICO G. HINOJOSA, Jr., YANEZ and RODRIGUEZ, JJ.

## OPINION

YANEZ, Justice.

We delivered an opinion in this matter on August 7, 1997, affirming the judgment of the trial court. We withdraw our prior opinion, and substitute the following as the opinion of this Court.

Veronica Zavala, appellant, was indicted for capital murder, and after the jury deadlocked in her first trial, the trial court declared a mistrial. She subsequently filed an application for writ of habeas corpus asserting that notions of double jeopardy precluded a re-trial. The trial court denied the application, and we affirmed the denial. *See Ex Parte Zavala*, 900 S.W.2d 867 (Tex.App.— Corpus Christi 1995, no pet.). At her second trial, the jury rendered a verdict of guilty on the capital murder charge, and the trial court assessed a life sentence. By four points of error, appellant asserts that the trial court erred in denying her motion to dismiss on double jeopardy grounds, in denying her motion to suppress her written and videotaped statements, and in denying her motion for instructed verdict. We affirm.

By her first point of error, appellant claims that the trial court erred in denying "Defen-

dant's Motion to Dismiss for Violation of Double Jeopardy" filed on August 12, 1994, and "Defendant's Special Plea in Bar for Violation of Double Jeopardy" filed August 23, 1994. Appellant maintained in said motions that she could not be retried on a capital murder charge because jeopardy had already attached in the first trial, and the jury had reached a decision of not guilty on that charge. Appellant complained that the jury was not allowed to enter its verdict because the trial court prematurely interrupted jury deliberations and declared a mistrial.

During her first trial, the jury deliberated for approximately two days. On the second day, the presiding juror presented the judge with a note stating that the jury had reached an impasse; it had agreed on "one charge," but had become hopelessly deadlocked on the remaining charges, and could not reach a decision on "the case."[1] Over appellant's objections, the trial court declared a mistrial.

Appellant's double jeopardy argument is two-part. First, she contends that the jury had reached a verdict of acquittal on the capital murder charge, and it disagreed only on the murder charge. In addition, she argues that, in light of the jury's representation that it had resolved one charge, the trial court abused its discretion in ordering a mistrial when it could have sent the jury back for further deliberations on the remaining charge. She contends that there was no manifest necessity which permitted the declaration of a mistrial and a subsequent retrial, and consequently her motion to dismiss the indictment before her second trial was error.

Appellant previously brought the first part of her double jeopardy argument before this Court through her petition for habeas corpus. *Ex parte Zavala*, 900 S.W.2d at 870. In *Ex Parte Zavala*, we evaluated the merits of appellant's contention that the jury had entered an informal verdict of acquittal in the first trial, which is identical to the argument presently raised. In that opinion, we noted that the trial court conducted a hearing on

the habeas application at which at least two jurors disputed the assertion that they had reached a unanimous verdict on the capital murder charge during the initial trial. We held that when a jury is charged with the task of reaching a verdict on multiple counts, it does not reach a verdict until it reaches a conclusion on all counts. *Ex parte Zavala*, 900 S.W.2d at 870 (citing *State ex rel. Hawthorn v. Giblin*, 589 S.W.2d 431, 432–33 (Tex. Crim.App.1979)). We affirmed the trial court's denial of relief, noting that appellant did not meet her burden of proving that jury had ever manifested a plain intent to acquit on all charges. *Ex parte Zavala*, 900 S.W.2d at 870.

■ Under the law of the case doctrine, an appellate court's resolution of a question of law in a previous appeal of the same case will govern the disposition of the same issue when raised in a subsequent appeal. *Ware v. State*, 736 S.W.2d 700, 701 (Tex.Crim.App. 1987). However, because the law of the case is required by neither the constitution nor statute, it "should be disregarded when compelling circumstances require redetermination of the point of law decided on the prior appeal." *Peden v. State*, 917 S.W.2d 941, 956 (Tex.App.—Fort Worth 1996, pet. ref'd ) (citing *Ex parte Granger*, 850 S.W.2d 513, 516 (Tex.Crim.App.1993)).

■ Appellant has not presented any additional argument as to why the jury's "conditional" verdict on the capital murder charge in the first trial should have been considered an acquittal, nor has she recited any compelling circumstance that would mitigate against relying on our prior treatment of this issue. Because there is no material difference between the court's ruling between the law governing the habeas question and the dismissal question, we will adhere to our prior ruling that appellant's retrial was not constitutionally prohibited.

With respect to appellant's second argument, that, during the first trial, the court did not allow the jury to deliberate for a sufficient time, we declined to address it

---

1. The jury charge allowed conviction either as a principal or as a party to the offense of capital murder (murder committed in course of aggra-vated sexual assault), or the lesser-included offense of murder.

because we did not consider it raised in her application for habeas corpus. Nonetheless, we mentioned that discharging a jury after two days of deliberations was not an abuse of discretion. *Ex parte Zavala*, 900 S.W.2d at 870. Appellant has asserted in a conclusory footnote in her brief, and now on motion for rehearing, that the issues presented in this point are "separate and distinct" from those presented in the appeal of the denial of habeas relief. Although our review of the record indicates that appellant's motion to dismiss, plea in bar, and her application for writ of habeas corpus were practically identical,[2] we will address the second part of appellant's present double jeopardy argument, in the interests of justice.

In her motion to dismiss the indictment, appellant complained about the trial court interrupting deliberations, not inquiring whether the jury had reached a verdict on the capital murder charge, and not allowing them to return to the jury room to memorialize their verdict on that charge on the verdict form. In her brief, she contends that the there was no manifest necessity in the first trial, and argues the court should have first issued an *Allen* charge[3] to the jury, requiring them to continue deliberations, before it declared a mistrial.

■ As a general rule, if, after the defendant is placed in jeopardy, the jury is discharged without reaching a verdict, double jeopardy will bar retrial. *Green v. United States*, 355 U.S. 184, 188, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957); *Wade v. Hunter*, 336 U.S. 684, 688, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *Brown v. State*, 907 S.W.2d 835, 838–39 (Tex.Crim.App.1995). "An exception to this rule is made if the defendant consents to a retrial, or if a retrial before a new judge is mandated by some form of manifest necessity." *Brown*, 907 S.W.2d at 839 (quoting *Torres v. State*, 614 S.W.2d 436, 441 (Tex. Crim.App.1981) (citing *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978), and, *Illinois v. Somer-*

*ville*, 410 U.S. 458, 461, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973)). Thus, where manifest necessity exists to declare a mistrial, the constitutional prohibition against double jeopardy is not implicated and retrial is permitted. *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087–88, 72 L.Ed.2d 416 (1982); *Brown*, 907 S.W.2d at 838.

■ Although no precise rule has been formulated with respect to the categories of circumstances in which manifest necessity exists, the Supreme Court has stated that a trial court's discretion to declare a mistrial based on manifest necessity is limited to "very extraordinary and striking circumstances...." *Brown*, 907 S.W.2d at 839 (citing *United States v. Jorn*, 400 U.S. 470, 480, 91 S.Ct. 547, 554–55, 27 L.Ed.2d 543 (1971), and *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963)). The inability of a jury to reach a verdict after considerable deliberations is one such circumstance. *Logan v. United States*, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Brown*, 907 S.W.2d at 838. Indeed, the code of criminal procedure allows the court "in its discretion" to declare a mistrial "where [the jury] has been kept together for such time as to render it altogether improbable that it can agree." TEX.CODE CRIM. PROC. ANN. art. 36.31 (Vernon 1979).

■ Before a court may declare a mistrial on this basis, however, it must consider less drastic alternatives. *Brown*, 907 S.W.2d at 838; *Ex parte Little*, 887 S.W.2d 62, 66 (Tex. Crim.App.1994); *Harrison v. State*, 788 S.W.2d 18, 22 (Tex.Crim.App.1990); and, *Torres*, 614 S.W.2d at 442. There can be no manifest necessity, and consequently no mistrial without the trial judge first reviewing the alternative courses of action and choosing the one, which, in light of all the circumstances, best preserves the defendant's "right to have his trial completed before a particular tribunal." *Brown*, 907 S.W.2d at

---

**2.** All three were presented at the same hearing on September 7, 1994, where defense counsel explained, "it's the same issues." The court denied all three motions in the same sentence. The double jeopardy arguments relied on by appellant and the evidence presented in support thereof were identical.

**3.** *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

838; *Harrison*, 788 S.W.2d at 23–24. Where a trial judge grants a mistrial despite the available option of less drastic alternatives there is no manifest necessity and we will find an abuse of discretion. *Little*, 887 S.W.2d at 66; *Harrison*, 788 S.W.2d at 23–24.

■ Appellate contends the trial court should have ordered the jury to continue deliberating. Despite the mandate that a trial judge consider other alternatives before granting a mistrial, appellant has not directed this Court to any authority indicating the existence of an affirmative duty on the trial court to issue an *Allen* charge. In fact, circumstances in the instant case, set out below, mitigated against sending the jury back to continue deliberations.

The record reflects that after deliberating for two days, the jury foreman wrote a note to the court stating that certain jurors had "taken a stand," and as a result, the jury could not reach a 12–0 decision either for or against the defendant. He also indicated that arguments had arisen and some jurors felt as though they were being personally attacked. Defense counsel requested that the court ask the jury if it had reached a verdict on the capital murder charge alone, which the court refused to do. The State subsequently moved for a mistrial, which the court also denied. The court was prepared to instruct the jury to continue deliberating rather than grant a mistrial. The trial court indicated, "If they can still make a decision, I'll have them come back tomorrow. If they answer me in the negative, then I will just tell them that I am going to be forced to do this [grant a mistrial]." The court asked the jury if it was in a "kind of deadlock," and the foreperson answered, "Yes, sir." The court then asked the jury whether, if it reconvened on the next day, there was a possibility it could reach a verdict. The jury foreperson indicated, "I don't feel at this time that—certain jurors have made a decision both ways. And I don't think that anybody could be swayed one way or another. I think everybody is in agreement as to how they feel, and I don't think one day or two days will make a difference." The court then asked the rest of the jury whether they were in agreement with the foreperson, and the record indicates all of the jurors indicated affirmatively.

■ Based on the note provided to the court from the jury foreman, together with the amount of time the jury had already deliberated, and the inquiry made by the court regarding the utility of further deliberations, we conclude the court did not abuse its discretion in declaring a mistrial at that point in time. The trial court may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. *Arizona*, 434 U.S. at 509, 98 S.Ct. at 832. The trial court is to be afforded broad discretion in such situations with respect to determining whether there is a manifest necessity; if it fails to discharge the jury, it risks a verdict reached from inherent pressures rather than from the considered judgment of all the jurors. *Id.* The record reflects that the court considered asking the jury to continue deliberating, but met with a unanimous response that further deliberation would be fruitless. The jury foreman had indicated that deliberations had already deteriorated to the point where arguments were perceived as personal attacks. It is reasonable to conclude that, in such an environment, the potential for a verdict based on reasoned deliberations has been irretrievably lost, or that such a risk is significant enough to justify declaring a mistrial. For these reasons, we see no abuse of discretion in the trial court declaring a mistrial when it did. Appellant's first point of error is overruled.

■ By her second and third points, respectively, appellant contends that the trial court erred in denying her motion for directed verdict because the evidence was legally insufficient to support her conviction, and because the evidence established her innocence as a matter of law. A challenge to the denial of a motion for directed verdict is essentially a challenge to the legal sufficiency of the evidence. *Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App.1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991); *Garcia v. State*, 827 S.W.2d 25, 26 (Tex.App.—Corpus Christi 1992, no pet.). In determining the merits of a legal insufficiency claim, we review the

evidence in the light most favorable to the judgment to determine if any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State,* 820 S.W.2d 154, 157 (Tex.Crim.App.1991). If the evidence is sufficient to sustain the conviction, then the trial judge did not err in overruling appellant's motion. *Madden,* 799 S.W.2d at 686.

▮▮▮ Appellant was indicted for intentionally causing the death of three-year-old Luis Daniel Blanco by strangling him with a ligature while in the course of committing aggravated sexual assault. The court's charge to the jury incorporated the indictment, and also allowed for her conviction as a party to the offenses charged. It also included instruction of the affirmative defense of duress, as appellant conceded at trial that she participated in some of the actions alleged, but did so under threats to her life.[4]

A person is criminally responsible as a party to an offense if the offense is committed by her own conduct, or by the conduct of another for which she is criminally responsible. TEX. PENAL CODE ANN. § 7.01 (Vernon 1994). A person is criminally responsible for an offense committed by another if, acting with intent to promote or assist in the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 1994). A person commits the offense of murder if she intentionally or knowingly causes the death of another. TEX. PENAL CODE ANN. § 19.02 (Vernon 1994). A person commits capital murder when such person commits murder in the course of committing or attempting to commit aggravated sexual assault. TEX. PENAL CODE ANN. § 19.03 (Vernon 1994). Aggravated sexual assault is committed when a person intentionally or knowingly (1) causes the penetration of the anus of a child younger than fourteen years

of age, (2) causes the penetration of the mouth of a child by the sexual organ of the actor, (3) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor, or (4) causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor. TEX. PENAL CODE ANN. § 22.021 (Vernon 1994).

Viewing the evidence adduced at trial in the light most favorable to the judgment, it showed that appellant was a neighbor of Carolina Blanco and her three children at an apartment complex in Brownsville, Texas. Appellant often visited with Blanco's son Luis. On July 9, 1993, appellant invited Luis to her apartment, and gave him a popsicle. A short while later, appellant went to the Blanco apartment to use the telephone. She then left the Blanco apartment with Luis without notifying Blanco. Appellant walked away from the complex with Luis towards Lincoln Park. Meanwhile, Blanco had become so worried that she called police to report her child missing.

When appellant and Luis arrived at the park, they stopped to rest,[5] and were confronted by Jose Alfredo Rivera, an acquaintance of appellant whom she knew as "Paye." The degree of appellant's familiarity with "Paye" is not clear. Appellant said that "Paye" was a friend of her uncle, and that "Paye" had often made sexual remarks to her in the neighborhood. She also said in one statement that he had raped her when she was sixteen.

Appellant gave several versions of what transpired in the park. She gave eight statements to the police (six in writing, and two on videotape), each one with different variations from the last. In every statement, she admitted that she was present during the murder of Luis. In most of the statements, appellant said that she was sexually assaulted by Rivera immediately before Luis was victimized. She claimed that Rivera had

---

4. It is an affirmative defense to prosecution if an actor engages in criminal conduct because she is compelled to do so by threat of imminent death or serious bodily injury. TEX. PENAL CODE ANN. § 8.05 (Vernon 1994); *see Kessler v. State,* 850 S.W.2d 217, 222 (Tex.App.—Fort Worth 1993, no

pet.)(threat must be a "present threat" to warrant instruction).

5. Appellant testified that she was walking to her mother's house.

forced her at knife-point to commit sexual acts on him, and to perform sexual acts on the child.[6] In some statements, she denied ever sexually assaulting Luis, while in others she admitted sexually assaulting Luis, but only under duress by Rivera.

According to one of appellant's statements, after sexually assaulting Luis, Rivera decided that Luis needed to die. Rivera proceeded to rip the elastic band off of Luis's underwear and used it as a ligature to choke the child. Appellant held Luis's arms down while Rivera strangled the child to death. Luis' body was discarded in a pond. This is also the version appellant testified to at trial, although she added that she held Luis down "to comfort him."

According to another version of events, relayed in one of appellant's handwritten statements, she claimed that she alone was responsible for killing Luis, but denied any sexual assault. In that statement, given July 11, 1993, appellant said she did not originally intend to kill Luis, but that while they walked together, she began thinking of things in her past which upset her: being raped when she was sixteen, her mother abandoning the family for a man, and problems with the grandmother who raised her. She said she had thoughts of killing her grandparents, her sisters, and her boyfriend. She said she had killed lizards and cats in the past, then would "open them up and think that it would be a person." She admitted that she had a problem. She explained that she was suicidal and angry at that point, and suddenly got the urge to kill Luis. She said she took his shoes, socks, and shirt off, and threw them in the water nearby. Then she removed his underwear and the elastic from the underwear and choked the boy with it. She denied sexually assaulting Luis, however.

Pathologist Marguerite DeWitt, M.D., testified that she inspected the child's body after it was recovered from a pond in the park. She said that Luis had an oval mark above his right nipple consistent with a bite

mark where appellant had indicated she bit him. He also had abrasions around his neck which likely resulted from strangling, which Dr. DeWitt opined was the cause of death. She also testified that Luis had tears in his anal area which strongly suggested that they were not caused naturally, but rather were consistent with the conclusion that they resulted from a sexual assault.

When appellant returned to her apartment, Luis' mother asked where her son was. Appellant said that she did not know. The next day, appellant went to her uncle's house and asked his girlfriend, Karina Ricarte, to do her a favor. Appellant said she was suspected of kidnaping a boy, and asked Ricarte if she would lie and say that she had been at the mall with appellant on July 9, 1993 at the time of the murder, even though it was not true.

Ricarte also testified that appellant had expressed an interest in sodomy, and had questioned her on numerous occasions about whether Ricarte ever had anal sex. Appellant also admitting discussing the subject with Ricarte, and admitted having the desire to have sexual intercourse with more than one person at a time.

Based on the forgoing evidence, we conclude that the evidence was sufficient to find appellant guilty of the offense of capital murder as charged in the indictment. Appellant admitted her presence during the sexual assault and murder, admitted she held the child down, and admitted she lied on numerous occasions in the days following the offense. Given the number of times appellant changed her story, we conclude that a jury could have rationally disbelieved her claims of duress and found that she committed the crimes on her own volition. Points two and three are overruled.

By her fourth point of error, appellant contends that the trial court erred in denying her motion to suppress her oral and written statements given to police. Appellant had filed a pretrial motion to suppress the statements during the first trial, and the trial

---

6. Appellant performed oral sex on "Paye" in front of the child. Then appellant proceeded to perform sex acts on Luis in Rivera's presence. Appellant helped remove the child's clothes, sucked on his chest above his nipple, performed oral sex on the child, and inserted her finger into Luis's anus.

court, after conducting a hearing, determined that the statements made had been voluntarily given.

Essentially, appellant contends that she was subjected to a lengthy custodial interrogation on the date of the offense. After she asserted her right to terminate the interview that evening, she contends she was approached before even leaving the police station and coerced into more questioning. She then was allowed to leave.

The next day, the child's body was recovered, and appellant was again questioned, while still not as a suspect and at her discretion. She offered to give a statement portraying herself as a victim of sexual assault in the park. Later in the day, she became a suspect and was arrested and given her *Miranda* warnings. Over the course of the next several days, appellant gave several statements to police. Appellant contends that the statement given on July 9, 1993, was taken in violation of her rights because she had expressed a desire to terminate the interview. She also categorically contends that every statement given during the following days should have been suppressed, because they all followed her invocation of her right to remain silent, presumably asserted on July 9, 1993.

The State contends that appellant was not being subjected to a custodial interrogation on the night of July 9, 1993; rather, she was simply being questioned as a witness because she was the last person seen with the child on the day of his disappearance. She was not arrested, the State maintains, until late in the day on July 10, 1993. Because the investigation on the evening of July 9, 1993 had not yet evolved from the investigatory to the accusatory or custodial stage, appellant's Fifth Amendment rights had not yet attached. *Melton v. State,* 790 S.W.2d 322, 326 (Tex.Crim.App.1990). Moreover, the State asserts that appellant was admonished of her rights before each of her statements given from July 10, 1993 onward.

On a motion to suppress evidence, the trial judge is the sole and exclusive trier of fact and judge of the credibility of witnesses, including the weight to be given their testimony. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App.1996); *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim. App.1990). In that regard, the court may believe the testimony of the State's witnesses and discount the testimony of those for the defense. If its findings are supported by the record, we are not at liberty to disturb them. *Green v. State,* 615 S.W.2d 700, 707 (Tex. Crim.App.1980), *cert. denied,* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). The trial court's ruling will not be disturbed absent an abuse of discretion. *Romero,* 800 S.W.2d at 543.

The key to appellant's argument rests on whether appellant was being subjected to a custodial interrogation on the night of July 9, 1993. Under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), if a person being subjected to a custodial interrogation indicates that they wish to remain silent and terminate the interrogation, the police must scrupulously honor that person's right to remain silent and terminate the interrogation. The obligation to administer warnings attaches only where there has been such a restriction on a person's freedom as to render him "in custody." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam); *White v. State,* 931 S.W.2d 736, 741 (Tex.App.—Corpus Christi 1996, pet. ref'd) (opinion on reh'g). Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or is otherwise deprived of his freedom of action in any significant way. *Ruth v. State,* 645 S.W.2d 432, 435 (Tex.Crim.App.1979); *White,* 931 S.W.2d at 741. A person is considered in custody if, under the circumstances, a reasonable person would believe that his or her freedom of movement was restrained to the degree associated with formal arrest. *Stansbury v. California,* 511 U.S. 318, 320–26, 114 S.Ct. 1526, 1527–31, 128 L.Ed.2d 293 (1994); *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App. 1996).

A person need not be under formal arrest to be considered subject to a custodial interrogation. *Melton,* 790 S.W.2d at 325. Historically, courts utilized four key

factors in making the determination of whether an interview can be considered a custodial interrogation: (1) whether the defendant was the focus of the investigation, (2) the subjective intent of the police, (3) whether probable cause to arrest existed at the time, and (4) the subjective belief of the defendant. *Id.* However, in *Stansbury v. California,* the Supreme Court emphasized that the initial determination of custody depends on the *objective* circumstances of the interrogation, rather than the subjective opinions of the interrogating officers and the person being questioned. 511 U.S. at 324–26, 114 S.Ct. at 1529–30; *Dowthitt,* 931 S.W.2d at 254. Consequently, factors one and two of the prior analysis are not considered as bearing upon the question of whether the individual is in custody for purposes of *Miranda* unless those views are disclosed during the questioning. *Stansbury,* 511 U.S. at 324–26, 114 S.Ct. at 1529–30; *Dowthitt,* 931 S.W.2d at 254; *White,* 931 S.W.2d at 741. Even then, the disclosure of such subjective views are not dispositive of the custody issue, as some suspects are free to come and go until police decide to make an arrest. *Stansbury,* 511 U.S. at 324–26, 114 S.Ct. at 1529–31; *Rodriguez v. State,* 939 S.W.2d 211 (Tex. App.—Austin 1997, n.p.h.).

If it is determined that a person was subjected to a custodial interrogation, then before any written statement made by an accused as a result of that interrogation can be admitted into evidence, it must first be shown on the face of the statement that the person was admonished of his *Miranda* rights. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 2 (Vernon 1979). Such showing need not be made if a statement offered into evidence was not the result of a custodial interrogation, however. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 5. If circumstances show that the person brought to a police station is acting only upon the request or urging of police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary and such person is not then in custody. *Anderson v. State,* 932 S.W.2d 502, 505 (Tex. Crim.App.1996); *Shiflet v. State,* 732 S.W.2d 622, 630 (Tex.Crim.App.1985).

At the suppression hearing, the State presented testimony from several police officers involved in the case who stated that appellant was not a suspect until the afternoon on Saturday, July 10, 1993, and that after she was arrested, she was admonished of her rights and chose instead to waive those rights each time she gave a statement. Janie Tejeda explained that on July 9, 1993, the police had not yet recovered the child's body and were investigating his disappearance. She said that appellant was questioned as a witness, rather than as a suspect. Tejeda said appellant had denied any knowledge of the whereabouts of the child. She said appellant was free to leave whenever she desired and did in fact leave that evening after speaking with police for several hours.

On the next morning, July 10, 1993, appellant was asked to come back to the police station for further questioning when the child's body was recovered. While there, she asked to be allowed to write a statement down. Tejeda observed appellant write out the statement describing how a stranger confronted them in the park and murdered Luis. After giving her first statement, Trevino said the officers escorted her to the park, where appellant provided a videotaped account of what happened. Samuel Lucio, who videotaped the statement, said appellant was still not considered a suspect at that point.

It was not until late in the day on July 10, 1993, after the child's body had been found that morning and appellant had provided two different statements, that she became a suspect and was arrested. Trevino, together with fellow Brownsville police officers Leonel Garza, Santiago Salinas, and Merlin Rasco provided proof that before each of her subsequent statements were given, she was admonished of all five of her Miranda rights, and initialed each right, then chose to waive those rights and provide statements. Trevino said appellant was never coerced to provide a statement.

Appellant testified that when she was brought to the police station for questioning on the evening of July 9, 1993, she knew she had a right to terminate the interview. She said that Tejeda had read appellant's rights

that evening, but said that she did not need a lawyer because she was not being threatened. She said she terminated the interview, and the officers let her go, but before she left the building, an officer said they wanted to ask her more questions. She agreed to go back and answer them. She said she was not forced or threatened into continuing the interview, and went home for the night after the questioning finished. Appellant testified that when she was asked to come back to the police station on the morning of July 10, she freely and voluntarily agreed to back.

Based on the testimony elicited and the hearing, and the statements themselves, the trial court found as follows:

... Defendant was interviewed on July 9, 1993, the date the victim disappeared. The defendant did not confess to any crime and was allowed to go home after she requested termination of the interview. The Defendant was not under arrest, but interviewed due to the fact that she was the last person to be seen with the victim, Luis Daniel Blanco. On Saturday July 10, 1993, the victim was found dead in a resaca. The defendant was again taken in for questioning, now that the child was found dead and during this questioning, the Miranda warning pursuant to Article 38.21 CCP were given. The Defendant during this day and subsequently, gave her own handwritten statements and written statements and two (2) video statements. The first video was not a confession but was taken since she argued that she was a victim. No rights were given to her. The second video statement does show that her rights were given. During the taking of all statements, she never asserted any of the constitutional rights that she was entitled to, although she clearly understood her rights.

The court is of the opinion and will rule that the Defendant's handwritten, typewritten and video statements/confessions are admissible. They were clearly freely and voluntarily given. No force was used. Further, the Defendant was not in custody nor under arrest on July 9, 1994[sic] when she chose to terminate her conversation with the Brownsville Police department.

She did not exert such right, at any of her written statements nor video statements, but she freely gave these statements. The second video statement further complies with Article 38.22, Sec. 3, and is admissible.

We conclude that the trial court acted within its discretion in admitting all eight statements. Because appellant was questioned with her consent, and was not a suspect initially, the police were not obligated to give her *Miranda* warnings, and therefore her expression of her desire to terminate the interview on July 9, 1993 was not an invocation of a Fifth Amendment right which thereby obligated police to cease any questioning. Her first statement was freely and voluntarily provided on July 10, 1993, as was her first videotaped statement in the park later that day. After she was arrested, she was admonished of her rights orally and in writing before giving every subsequent statement, and therefore, the statements were admissible. Appellant never explained why the statements taken on July 10, 1993 and thereafter should be suppressed, except in their relation to her assertion of her desire to terminate the interview on July 9, 1993. Point four is overruled.

The judgment of the trial court is AFFIRMED.