

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00333-CR

ALANDUS WEAVER                                    APPELLANT

V.

THE STATE OF TEXAS                                    STATE

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In four points, Appellant Alandus Weaver appeals from his conviction for the murder of his eight-month-old daughter, D.W. We affirm.

---
[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

On June 9, 2009, Tamaira Creagh, D.W.'s mother, called 911 and reported that a man had entered her North Dallas apartment, attempted to rape her, and then kidnapped D.W.[2] Weaver arrived at the apartment shortly after Dallas police and was told about the attack and abduction. Dallas police took Weaver, and, after she was released from medical care, Creagh to police headquarters to question them about D.W.'s disappearance. Police placed Creagh and Weaver alone together in an interview room, and Creagh told Weaver that she had signed consent-to-search forms. Weaver became visibly angry, swore, and said that there was blood on the baby's bed. The police videotaped the couple's conversation.

After obtaining a search warrant, police searched the couple's Denton County apartment and found a red towel on the floor, a baby's onesie with blood on it, a pack-n-play with a red stain, and sheets, a comforter, a blanket, and pillow cases with possible blood stains. The police also found two baby blankets inside a nearby dumpster.

On June 13, 2009, Creagh, through her attorney, contacted the detectives assigned to the case and told them that she and Weaver had fabricated the rape and kidnapping story to cover up D.W.'s death. Dallas police then questioned

---

[2]At the time of D.W.'s death, Weaver and Creagh were moving from an apartment complex in North Dallas to an apartment in Denton County. The 911 call reporting D.W.'s kidnapping originated from the couple's North Dallas apartment.

Weaver. On July 2, 2009, after several interviews in which he gave several versions of events, Weaver admitted that D.W. died in his care.[3] D.W.'s body was never found.

After he was indicted for D.W.'s murder, Weaver filed a motion to suppress the recordings of his conversation with Creagh and his statements to the police.[4] At the suppression hearing, Dallas Police Detective Abel Lopez stated that he had used his new iPhone as a recording device during the July 2, 2009 interrogation. He said that some portions of the interview were not recorded because every incoming call or text message had caused the recording to stop, and that it remained stopped until Lopez noticed and restarted it. Although Weaver testified that he had requested an attorney several times during the interrogations, Dallas Police Detectives Emilio Henry, Corey Foreman, and Lopez all testified that Weaver never asked for an attorney.

The trial court denied Weaver's motion as to all of Weaver's recorded statements, but it sustained his motion on any unrecorded statements. Following the suppression hearing, the trial court issued written findings of fact and conclusions of law. The trial court found (1) that Weaver was given his *Miranda* warnings before each interview, (2) that the detectives' testimonies were credible and convincing, and (3) that Weaver's testimony was not credible or convincing.

---

[3]Because Weaver challenges the sufficiency of the evidence to uphold his conviction, we set out the evidence in detail below.

[4]The record does not contain a copy of Weaver's written motion.

3

The trial court also concluded that all of Weaver's recorded statements were made freely and voluntarily and that Weaver did not invoke his right to counsel at any time.

At trial, Weaver stated that he had "no objection" to the admission of the videotaped recording of the conversation between Creagh and himself. Weaver objected to the admission of all of his other statements to the police. A jury convicted Weaver of murder. The trial court assessed punishment and sentenced Weaver to life imprisonment. This appeal followed.

### III. Suppression of Statements

In his third point, Weaver argues that the content and recordings of his statements should have been suppressed because the statements were not voluntary. State's exhibit six is a recording of Weaver's interaction with Creagh while they were alone together in the interrogation room. Weaver claims that his statements were not voluntary because he was not properly warned of his rights and was not aware that he was being recorded. The remaining exhibits are recordings of both noncustodial and custodial interrogations in which the warnings were given. Weaver claims that the statements in those recordings were not voluntary because he was denied his right to counsel.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

4

In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the

5

trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

## B. Applicable Law

The United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. When an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966). The Fifth Amendment thus requires officers to advise a suspect whom they have arrested that he has the right to remain silent and to have an attorney present during questioning. *ED.W.ards v. Arizona*, 451 U.S. 477, 481–82, 101 S. Ct. 1880, 1883 (1981). The Fifth Amendment right to counsel will attach only when affirmatively invoked by the suspect. *Miranda*, 384 U.S. at 473–74, 86 S. Ct. at 1627.

6

## C. Analysis

Weaver first asserts that his statements on the recording of his conversation with Creagh, including his statement that there was blood in D.W.'s bed, were not voluntary because he was not given *Miranda* warnings. *See Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630.

At trial, Weaver, outside the presence of the jury, reurged his motion to suppress, which the trial court denied. However, when the recording was then offered during trial, Weaver's counsel said, "Your Honor, I have no objection." When a pretrial motion to suppress evidence is overruled, the accused need not subsequently object to the admission of the same evidence at trial in order to preserve error. *James v. State*, 772 S.W.2d 84, 97 (Tex. Crim. App.), *vacated on other grounds*, 493 U.S. 885 (1989). However, when the accused affirmatively asserts during trial that he has "no objection" to the evidence, he waives any error in its admission. *Id*. Therefore, Weaver waived any error in the trial court's suppression ruling as to State's exhibit six and forfeited the right to complain about it on appeal.[5]

---

[5]Even if the issue had been preserved, Weaver does not suggest that he was in custody or that there was any questioning by law enforcement officers when the statements on this recording were made. *Miranda* only applies to custodial interrogations. *Miranda*, 384 U.S. at 467, 86 S. Ct. at 1624 ("[T]he process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures . . . ."). Weaver also argues that these statements should have been suppressed because he was unaware that he was being recorded. However, the law does not require that he be so informed. *See, e.g.,* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005); *Moore v. State*, 882 S.W.2d 844, 846 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1114 (1995).

Weaver further asserts that his statements to the police should have been suppressed because he requested to have an attorney present but was denied that right. At the suppression hearing, the trial court heard testimony from the interrogating officers that Weaver did not make any requests for an attorney. Additionally, Weaver testified that he had requested an attorney during gaps in the recordings and during a restroom break, that he did not think he had asked for an attorney at one interview, and that he asked "towards the end" of another interview. In his written findings of fact and conclusions of law, the trial court stated that it found the officers' testimony to be credible and convincing and that Weaver's testimony was not.

Because the question turns entirely on the credibility of the witnesses, we defer to the trial court's findings of fact. *See Kelly*, 204 S.W.3d at 818–19. These findings are dispositive of the legal ruling: that Weaver did not invoke his right to counsel at any point. *Id.* at 818. We overrule Weaver's third point.

### IV. Legal Sufficiency

In his second point, Weaver argues that the evidence was legally insufficient to prove that he committed felony murder or the underlying felony, injury to a child. Specifically, Weaver asserts that the State failed to prove that he was responsible for D.W.'s death, rather than some third party, and that the

8

State failed to prove that he had the requisite culpable mental state required for injury to a child.

## A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). Juries may draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Hooper*, 214 S.W.3d at 15. The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Hardy v. State*, 281 S.W.3d 414, 421 (Tex. Crim. App. 2009); *Malik v. State*, 953

S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App.), *cert. denied*, 130 S. Ct. 515 (2009); *Malik,* 953 S.W.2d at 240.

## B. Applicable Law

A person may be convicted of murder when "in the course of and in furtherance of the commission or attempt [of a felony], . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(3) (West 2011). Here, the underlying felony is injury to a child. A person commits the offense of injury to a child "if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, . . . : (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury". *Id*. § 22.04(a) (West 2011). Injury to a child is a result-oriented or "result of conduct" crime. *Patterson v. State*, 46 S.W.3d 294, 301 (Tex. App.—Fort Worth 2001, no pet.). That is, the culpable mental state relates not to the nature of or circumstances surrounding the charged conduct, but to the *result* of the defendant's conduct. *Id.* (citing *Haggins v. State*, 785 S.W.2d 827, 828 (Tex. Crim. App. 1990)); *see also Alvarado v. State*, 704 S.W.2d 36, 38–39 (Tex. Crim. App. 1985); *Beggs v. State*, 597 S.W.2d 375, 377 (Tex. Crim. App. [Panel Op.] 1980). Put another way, the conduct must be done with the required culpability

10

to effect the result. *Patterson*, 46 S.W.3d at 301 (citing *Alvarado*, 704 S.W.2d at 39).

Here, the jury charge stated that Weaver

commit[ted] or attempt[ed] to commit a felony, to-wit: Injury to a Child, and in the course of and in furtherance of the commission or attempt of said Injury to a Child offense, the defendant committed or attempted to commit an act clearly dangerous to human life, to-wit: by shaking [D.W]., by causing [D.W.] to strike an unknown object, by striking [D.W.] with an unknown object, by repeatedly pouring water in [D.W.'s] mouth or by submersing [D.W.] in water that caused the death of [D.W].[6]

## C. Evidence at Trial

### 1. Creagh's Testimony

Creagh testified that on June 13, 2009, she recanted the rape and kidnapping story and told police that she left D.W. with Weaver when she went to work on June 8, 2009; that when Weaver picked her up from work later that day, D.W. was not with him; that when they arrived at the Denton County apartment, D.W. was lying on the floor under a red towel, naked and covered with bruises; that D.W. was limp and not breathing; and that Weaver would not allow Creagh to call 911. She said that after Weaver's attempts to revive D.W. failed, they put D.W. in a car seat in the back seat of Weaver's car and drove around to find a place to dispose of D.W.'s body. When Weaver and Creagh determined that they did not have enough gas to get to Lake Lewisville, they returned to their apartment, left D.W.'s body in the car, and went to bed.

---

[6]Weaver does not challenge any part of the trial court's charge to the jury.

11

Creagh said that the next day, with D.W.'s body in the back seat of the car and beginning to smell, Weaver took Creagh to work at 2:30 p.m. and told her to obtain a daily bonus sufficient to pay for enough gas to get to Lake Lewisville. She said that Weaver, still with D.W.'s body in the car, picked Creagh up from work around 9:00 p.m., purchased gas with a ten-dollar bonus Creagh had earned, and headed to Lake Lewisville to dispose of D.W.'s body. On the way to the lake, Creagh recalled Weaver asking a police officer for directions. She also said that Weaver stopped at a construction site to pick up a sandbag that he later tied to D.W.'s leg before dropping her body into the water. Creagh said the couple then went to the Dallas County apartment where they staged the story about the attempted rape and kidnapping. To make the story more believable, Creagh said that Weaver stretched her clothes, pulled her hair, and hit her in the face.

Creagh said that she cooperated with Weaver because she was afraid of him. During her testimony, the State introduced Creagh's timeslips from her job showing when she worked on June 8, 2009, and June 9, 2009.[7] Also during Creagh's testimony, the State published to the jury the June 10, 2009 recording of Weaver and Creagh in the police interview room showing Weaver's displeasure at Creagh's signing consent-to-search forms.

---

[7]Although Creagh testified that she worked from 2 p.m. to 9 p.m. on June 8 and from 3 p.m. to 9 p.m. on June 9, her timesheet reflects that she actually worked from 3 p.m. to 9 p.m. on June 8 , and from 2 p.m. to 9 p.m. on June 9.

12

## 2. Dallas Police Detective Emilio Henry's Testimony

Detective Henry testified that he was involved from the beginning of the investigation and that he interviewed Creagh and Weaver early in the morning on June 10, 2009. He stated that Weaver remained steadfast in the rape and kidnapping story. He confirmed that Creagh had signed consent forms allowing police to search the couple's Denton County apartment and that when Weaver learned of Creagh's consent, Weaver became visibly angry with her and stated, "You didn't have to sign shit. You know there's blood in the baby's bed."[8]

Detective Henry said that on June 13, 2009, after speaking with Creagh, the course of the investigation changed from rape and kidnapping to tampering with evidence and murder. He stated that on June 13, 2009, he also spoke with Weaver, who had been arrested and was being held on an unrelated traffic warrant, and that after Weaver waived his rights, Weaver admitted that the rape and kidnapping story was not true.

Detective Henry testified that he next spoke with Weaver at Weaver's request on July 2, 2009, at the Denton County jail. Detective Henry then recited the events depicted in State's exhibit nine, a recording of his last interview with Weaver that was published to the jury at the end of the Detective's testimony, which we detail below. He concluded by confirming that on July 3, 2009, Weaver took the detectives to the construction site where he had obtained the sandbag

---

[8]In addition to recording Weaver and Creagh in the interview room, the officers observed them "live" via closed-circuit monitors.

used to weigh down D.W.'s body and to the location on the bridge where he dropped D.W.'s body into Lake Lewisville.

### 3. State's Exhibit Nine: Recording of Weaver's July 2, 2009 Interview[9]

On July 2, 2009, at Weaver's request, Detectives Henry, Lopez, and Foreman met with Weaver at the Denton County jail. After waiving his rights, Weaver first told the officers that D.W.'s neck had swollen after she had eaten an orange and that although she had trouble swallowing, he did not take her to the doctor. He then said that he had D.W. with him when he picked up Creagh from work on June 9, 2009, and that after he went to the North Dallas apartment, he put the baby carrier down on the floor, flipped open the top, noticed that D.W. was not breathing, and performed CPR.

Weaver later admitted that on June 9, 2009, while bathing D.W., he had poured six to eight cups of water on her head to rinse the soap out of her hair, and that she had choked on the water. He said that D.W. seemed lifeless as he dried her and put her diaper on, that her eyes looked like she was falling asleep, that he did not feel her move when he was doing her hair, and that he left her on a towel on the floor. He admitted that D.W. died two hours before he picked Creagh up from work and that he and Creagh left D.W.'s body in the car

_____

[9]Although all of Weaver's recorded pretrial statements were admitted into evidence, only the recording of his July 2, 2009 statement was published to the jury.

14

overnight. He confirmed that he had asked a neighbor about a lake, that he had stopped at a construction site to pick up a sandbag to weigh D.W.'s body down, and that he had talked to a police officer before he and Creagh had disposed of D.W.'s body in Lake Lewisville. Weaver then offered to show the detectives where he had dumped D.W.'s body into the lake. At the conclusion of the interview, Weaver confirmed that he had asked to speak to the detectives and that he did so voluntarily.

### 4. Additional Prosecution Witnesses' Testimonies

Dr. Matthew Cox, a board-certified pediatrician, testified that the vast majority of infant drownings are accidental and result from neglectful supervision, such as "children left unsupervised in a bath tub who have become submerged and can't protect themselves." He also said that based on his experience and training, physical signs that a child was drowning would include a "struggle, trying to breathe . . . gasping for breath, moving around. . . . [C]hoking noises." He also testified that appropriately performed CPR would leave at most small bruises over the breast bone, but no bruising on the child's face or stomach.

Search One Rescue Team Member Paul Lake testified that two dogs trained to detect human remains independently alerted on Weaver's car. Hickory Creek Police Officer Jason Stevens testified that on June 9, 2009, he observed Weaver run a stop sign but said that before he could pull Weaver over, Weaver pulled over alongside his marked patrol car, indicated that he was trying to get to a hospital and asked Stevens for directions to Lewisville. Stevens said he

directed Weaver to Interstate Highway 35—a route that included a bridge across Lake Lewisville. Dallas County Crime Lab Analysts Christi Wells and Angela Fitzwater testified that the items collected from Creagh and Weaver's apartment tested positive for human blood and that based on DNA analysis, there was a one in 3.42 trillion chance that Weaver and Creagh were not the biological parents of the person whose blood was on the collected items. Dallas Crime Scene Detective Will Vick testified that he found sand on the front passenger floorboard of Weaver's car.

All Nations Fellowship Church Pastor Robert Cannady, Creagh's pastor, testified that on June 12, 2009, Creagh told him what had happened to D.W. and that he advised her to contact an attorney and to tell the police the truth. Tammy Creagh, Creagh's aunt, and Pamara Childress, Creagh's mother, both testified that on the night of the alleged rape and kidnapping, Weaver did not appear distraught about D.W.'s disappearance. Harold Hall, Weaver and Creagh's Denton County neighbor, testified that about 3:30 p.m. on June 9, 2009, Weaver asked him about lakes in the area, and he told Weaver that Lake Lewisville was close by.

Bryan Perry, Weaver's childhood friend who was called by the prosecution, testified on cross-examination that he had never seen Weaver physically hurt Creagh but that he had witnessed Creagh attack Weaver.

### 5. Weaver's Testimony

Weaver testified that he was D.W.'s primary caregiver, that Creagh was with D.W. when she stopped breathing, and that because Creagh feared she would go to jail, she insisted that they hide the body. He said that the couple drove to Lake Lewisville the night of D.W.'s death but that he convinced Creagh not to drop D.W.'s body in. He also said that he took Creagh back to their apartment, left for a while, and returned to find that Creagh had called 911 with the kidnapping story that she had made up.

During cross-examination, Weaver admitted that he had lied to the police and that he had told police several versions of the events. He also admitted that he told police that D.W. had drowned and that he had thrown D.W.'s body into Lake Lewisville.

## D. Analysis

### 1. Proof of Identity

Weaver argues that no direct evidence proves that he was the guilty party.[10] The State relied extensively on circumstantial evidence, but circumstantial evidence can be as probative as direct evidence. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. As we have detailed above, the record is replete with Weaver's admissions, attempts to conceal incriminating

---

[10]Weaver suggests various alternate hypotheses consistent with the evidence. However, the alternate reasonable hypothesis theory does not apply to a legal sufficiency review. *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999).

evidence, inconsistent statements, and implausible explanations, which are all probative of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). These not only tend to prove that the crime occurred, but also tend to point specifically to Weaver as the guilty party. *See id.* Although Weaver's extrajudicial admissions do not amount to a full confession, they do permit a reasonable inference of his guilt. The jury was free to draw multiple reasonable inferences from Weaver's conflicting admissions. *See Zavala v. State*, 956 S.W.2d 715, 722 (Tex. App.—Corpus Christi 1997, no pet.) ("Given the number of times appellant changed her story, we conclude that a jury could have found . . . that she committed the crimes of her own volition.").

Because we must presume that the factfinder resolved any conflicting inferences against Weaver and defer to that resolution, we hold that a rational factfinder could have believed that Weaver was the guilty party beyond a reasonable doubt. *See Matson*, 819 S.W.2d at 846.

## 2. Proof of Culpable Mental State

Weaver points out that the State did not present any direct evidence of a culpable mental state as an element of injury to a child.[11] However, mental state may be inferred from circumstantial evidence such as acts, words, and conduct.

---

[11]The felony murder rule dispenses with the necessity of proving mens rea accompanying the homicide itself; the underlying felony supplies the culpable mental state. *See generally Flores v. State*, 102 S.W.3d 328, 330 (Tex. App.— Eastland 2003, pet. ref'd) (citing *Johnson v. State*, 4 S.W.3d 254, 255 (Tex. Crim. App.1999)).

18

*Guevara*, 152 S.W.3d at 50. In injury to a child cases, there is rarely direct evidence of exactly how the injuries occurred, which is why the culpable mental state may be inferred from circumstantial evidence. *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

The evidence supports the reasonable inference that Weaver acted with one of the culpable mental states alleged in the indictment and set out in the jury charge. First, there was testimony that Weaver prevented Creagh from calling 911 when she found D.W.'s body. A reasonable juror could infer that this showed a consciousness of guilt and that, therefore, D.W.'s death was not caused by a mere accident, but rather by an intentional, knowing, reckless, or criminally negligent act. *See* Tex. Penal Code Ann. § 6.03 (West 2011); *Fuentes v. State*, 880 S.W.2d 857, 860–61 (Tex. App.—Amarillo 1994, pet. ref'd) (stating that the jury could infer that defendant acted intentionally or knowingly by omission when he failed to seek medical care when he thought baby's arm was broken).

A similar inference could be drawn from the false kidnapping story. Weaver's efforts to conceal D.W.'s body strongly imply a consciousness of guilt. So, too, does Weaver's angry outburst when Creagh told him she had signed the consent-to-search forms. We defer to the factfinder's resolution of any conflicting inferences. *See Matson*, 819 S.W.2d at 846. There was sufficient evidence for the jury to reasonably infer that Weaver acted with one of the alleged mental states. *See Guevara*, 152 S.W.3d at 50; *Haggins*, 785 S.W.2d at 827.

19

Based on the evidence set out above, we conclude that a rational trier of fact could have found each element of injury to a child and of felony murder beyond a reasonable doubt. We overrule Weaver's second point.

### V. Accomplice Testimony

In his first point, Weaver contends that his conviction was improperly based on accomplice testimony.

### A. Standard of Review

Article 38.14 of the code of criminal procedure provides that

> [a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005).

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Malone*, 253 S.W.3d at 257; *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). Nor is it necessary for the

20

corroborating evidence to directly link the accused to the commission of the offense. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). Rather, the evidence must simply link the accused in some way to the commission of the crime and show that "rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).

There is no set amount of nonaccomplice corroboration evidence that is required for sufficiency purposes; "[e]ach case must be judged on its own facts." *Malone*, 253 S.W.3d at 257 (quoting *Gill*, 873 S.W.2d at 48). Circumstances that are apparently insignificant may constitute sufficient evidence of corroboration. *Trevino*, 991 S.W.2d at 852.

Additionally, "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Malone*, 253 S.W.3d at 257 (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). But "mere presence alone of a defendant at the scene of a crime is insufficient to corroborate accomplice testimony." *Id.* (quoting *Golden v. State*, 851 S.W.2d 291, 294 (Tex. Crim. App. 1993)).

21

The accomplice-witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal sufficiency standards. *Cathey*, 992 S.W.2d at 462–63.

## B. Analysis

The record contains significant nonaccomplice evidence tending to connect Weaver with the crime, including Weaver's own statements. In State's exhibit nine, Weaver admitted that D.W. died while alone with him and that D.W. was not with him when he picked Creagh up from work. Weaver also admitted driving to the lake, finding a sandbag to tie to D.W.'s body, and dropping D.W.'s body into the water. Weaver's admissions corroborate Creagh's accomplice testimony and tend to connect Weaver with the crime. *See Malone*, 253 S.W.3d at 257; *see also Cox v. State*, 830 S.W.2d 609, 611–612 (Tex. Crim. App. 1992) (concluding that appellant's confession that he was at scene, combined with other suspicious factors, was sufficient to corroborate accomplice testimony); *Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990) (noting that a defendant's confession that is not dependent upon accomplice testimony for proof may be sufficient to corroborate accomplice testimony), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 300 (Tex. Crim. App. 1994); *Jackson v. State*, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974) ("It is well established that appellant's admission . . . , under most circumstances, will be sufficient to corroborate the accomplice witness.")

Additionally, Weaver's admissions were not the only nonaccomplice evidence. Hall testified that on the afternoon of June 9, 2009, while Creagh was still at work, Weaver asked him if he knew "where any good lakes were," and that he directed Weaver to Lake Lewisville. Officer Stevens testified that he encountered Weaver near Lake Lewisville at the relevant time. Cadaver search dogs alerted on Weaver's car, sand was found on the car's floor, and D.W.'s blood (identified by DNA testing) was found on several items taken from the Denton County apartment and on two blankets found in a nearby dumpster. Additionally, Creagh's timesheets from her job corroborated that she was away from the apartment at the critical time. All this evidence tends not only to show that an offense was committed but also to connect Weaver to the offense. *See* Tex. Code Crim. Proc. Ann. art. 38.14; *Carillo v. State*, 566 S.W.2d 902, 908 (Tex. Crim. App. 1978) (holding that sufficient evidence "meshe[d] perfectly" with accomplice testimony).

The above non-accomplice corroborating evidence need not have been sufficient to prove guilt beyond a reasonable doubt. *Simmons*, 282 S.W.3d at 508. It was, however, sufficient for a rational jury to have concluded that the corroborating evidence tended to connect Weaver to the murder. *See id*.; *Cathey*, 992 S.W.2d at 462. We overrule Weaver's first point.

23

## VI. Mistrial

In his fourth point, Weaver contends that the trial court abused its discretion by denying his motion for a mistrial following a question about Weaver hitting Creagh.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004); *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

Mistrial is appropriate for only "highly prejudicial and incurable errors," and the trial court is required to grant a motion for a mistrial only when the improper evidence is "clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *See Simpson*, 119 S.W.3d at 272; *Wood*, 18 S.W.3d at 648; *see also Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (stating that a motion for mistrial will be granted only in "extreme circumstances, where the prejudice is incurable"). When an improper question is not answered, an instruction to disregard will usually render any error harmless. *Turner v. State,* 719 S.W.2d 190, 194 (Tex. Crim. App. 1986).

Weaver's issue is based on the following exchange:

Q. [State]      Did you ever see the picture of [Creagh] in the hospital where she had the cut on the inside of her mouth?

A. [Detective Foreman]    I didn't see the picture, no.

24

| | |
|---|---|
| Q. [State] | Well, if she had a cut on the inside of her mouth, that might be evidence that someone hit her, though? |
| [Defense]: | Objection, Your Honor. Assuming facts not in evidence. |
| The Court: | Sustained. |
| [Defense]: | Ask the Court to instruct the jury to disregard. |
| The Court: | Ladies and gentlemen, you'll disregard the last question. |
| [Defense]: | Move for a mistrial, Your Honor. |
| The Court: | Denied. |

We note first that the objected-to question was not answered, so the trial court's instruction to disregard rendered any error harmless unless it was clearly prejudicial or of such a character that its impression could not be withdrawn. *See id*. We further note that before this exchange, the photograph in question had already been admitted into evidence without objection and that Creagh had testified, also without objection, that she received the cut depicted when Weaver hit her to substantiate the attempted rape story. In addition, Creagh later testified, in response to defense counsel's questions, to numerous beatings by Weaver. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (holding that no error occurred "when other such evidence was received without objection, either before or after the complained-of ruling"). Under these circumstances, the unanswered question was neither clearly prejudicial nor

25

impossible to disregard. As a result, the trial court did not abuse its discretion in denying the motion for a mistrial. We overrule Weaver's fourth point.

## VII. Conclusion

Having overruled each of Weaver's points, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: September 15, 2011