02-10-333-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00333-CR

 

 


 
 
 ALANDUS WEAVER
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

 

FROM THE 211TH DISTRICT Court OF DENTON
COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

          In
four points, Appellant Alandus Weaver appeals from his conviction for the
murder of his eight-month-old daughter, D.W.  We affirm.

II. 
Factual and Procedural Background

          On
June 9, 2009, Tamaira Creagh, D.W.’s mother, called 911 and reported that a man
had entered her North Dallas apartment, attempted to rape her, and then
kidnapped D.W.[2]  Weaver arrived at the
apartment shortly after Dallas police and was told about the attack and
abduction.  Dallas police took Weaver, and, after she was released from medical
care, Creagh to police headquarters to question them about D.W.’s
disappearance.  Police placed Creagh and Weaver alone together in an interview
room, and Creagh told Weaver that she had signed consent-to-search forms.  Weaver
became visibly angry, swore, and said that there was blood on the baby’s bed.  The
police videotaped the couple’s conversation.

          After
obtaining a search warrant, police searched the couple’s Denton County apartment
and found a red towel on the floor, a baby’s onesie with blood on it, a pack-n-play
with a red stain, and sheets, a comforter, a blanket, and pillow cases with
possible blood stains.  The police also found two baby blankets inside a nearby
dumpster.

          On
June 13, 2009, Creagh, through her attorney, contacted the detectives assigned
to the case and told them that she and Weaver had fabricated the rape and
kidnapping story to cover up D.W.’s death.  Dallas police then questioned
Weaver.  On July 2, 2009, after several interviews in which he gave several
versions of events, Weaver admitted that D.W. died in his care.[3]
 D.W.’s body was never found.

          After
he was indicted for D.W.’s murder, Weaver filed a motion to suppress the
recordings of his conversation with Creagh and his statements to the police.[4]
 At the suppression hearing, Dallas Police Detective Abel Lopez stated that he
had used his new iPhone as a recording device during the July 2, 2009 interrogation.
 He said that some portions of the interview were not recorded because every
incoming call or text message had caused the recording to stop, and that it
remained stopped until Lopez noticed and restarted it.  Although Weaver
testified that he had requested an attorney several times during the
interrogations, Dallas Police Detectives Emilio Henry, Corey Foreman, and Lopez
all testified that Weaver never asked for an attorney.

          The
trial court denied Weaver’s motion as to all of Weaver’s recorded statements,
but it sustained his motion on any unrecorded statements.  Following the
suppression hearing, the trial court issued written findings of fact and
conclusions of law.  The trial court found (1) that Weaver was given his Miranda
warnings before each interview, (2) that the detectives’ testimonies were
credible and convincing, and (3) that Weaver’s testimony was not credible or
convincing.  The trial court also concluded that all of Weaver’s recorded
statements were made freely and voluntarily and that Weaver did not invoke his
right to counsel at any time.

          At
trial, Weaver stated that he had “no objection” to the admission of the videotaped
recording of the conversation between Creagh and himself.  Weaver objected to
the admission of all of his other statements to the police.  A jury convicted
Weaver of murder.  The trial court assessed punishment and sentenced Weaver to
life imprisonment.  This appeal followed.

III.
 Suppression of Statements

          In
his third point, Weaver argues that the content and recordings of his
statements should have been suppressed because the statements were not
voluntary.  State’s exhibit six is a recording of Weaver’s interaction with
Creagh while they were alone together in the interrogation room.  Weaver claims
that his statements were not voluntary because he was not properly warned of
his rights and was not aware that he was being recorded.  The remaining
exhibits are recordings of both noncustodial and custodial interrogations in
which the warnings were given.  Weaver claims that the statements in those
recordings were not voluntary because he was denied his right to counsel.

A.  Standard of Review

          We
review a trial court’s ruling on a motion to suppress evidence under a
bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  In reviewing the trial court’s decision, we do not engage in our
own factual review.  Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim.
App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth
2003, no pet.).  The trial judge is the sole trier of fact and judge of the
credibility of the witnesses and the weight to be given their testimony.  Wiede
v. State, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); State v. Ross,
32 S.W.3d 853, 855 (Tex. Crim. App. 2000), modified on other grounds by State
v. Cullen, 195 S.W.3d 696 (Tex. Crim. App. 2006).  Therefore, we give
almost total deference to the trial court’s rulings on (1) questions of
historical fact, even if the trial court’s determination of those facts was not
based on an evaluation of credibility and demeanor, and
(2) application-of-law-to-fact questions that turn on an evaluation of
credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez v.
State, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); Johnson v. State,
68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).  But when
application-of-law-to-fact questions do not turn on the credibility and
demeanor of the witnesses, we review the trial court’s rulings on those
questions de novo.  Amador, 221 S.W.3d at 673; Estrada v. State,
154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson, 68 S.W.3d at
652–53.

          Stated
another way, when reviewing the trial court’s ruling on a motion to suppress,
we must view the evidence in the light most favorable to the trial court’s
ruling.  Wiede, 214 S.W.3d at 24; State v. Kelly, 204 S.W.3d 808,
818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact findings,
we determine whether the evidence, when viewed in the light most favorable to
the trial court’s ruling, supports those fact findings.  Kelly, 204
S.W.3d at 818–19.  We then review the trial court’s legal ruling de novo
unless its explicit fact findings that are supported by the record are also
dispositive of the legal ruling.  Id. at 818.

          We
must uphold the trial court’s ruling if it is supported by the record and
correct under any theory of law applicable to the case even if the trial court
gave the wrong reason for its ruling.  State v. Stevens, 235 S.W.3d 736,
740 (Tex. Crim. App. 2007); Armendariz v. State, 123 S.W.3d 401, 404
(Tex. Crim. App. 2003), cert. denied, 541 U.S. 974 (2004).

B.  Applicable
Law

          The
United States Constitution provides that no person “shall be compelled in any
criminal case to be a witness against himself.” U.S. Const. amend. V.  When an
individual is taken into custody or otherwise deprived of his freedom by the
authorities in any significant way and is subjected to questioning, the
privilege against self-incrimination is jeopardized.  Miranda v. Arizona,
384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966).  The Fifth Amendment thus requires
officers to advise a suspect whom they have arrested that he has the right to
remain silent and to have an attorney present during questioning.  ED.W.ards
v. Arizona, 451 U.S. 477, 481–82, 101 S. Ct. 1880, 1883 (1981).  The Fifth
Amendment right to counsel will attach only when affirmatively invoked by the
suspect.  Miranda, 384 U.S. at 473–74, 86 S. Ct. at 1627.

C.  Analysis

          Weaver
first asserts that his statements on the recording of his conversation with
Creagh, including his statement that there was blood in D.W.’s bed, were not
voluntary because he was not given Miranda warnings.  See Miranda,
384 U.S. at 478, 86 S. Ct. at 1630.

          At
trial, Weaver, outside the presence of the jury, reurged his motion to suppress,
which the trial court denied.  However, when the recording was then offered
during trial, Weaver’s counsel said, “Your Honor, I have no objection.”  When a
pretrial motion to suppress evidence is overruled, the accused need not
subsequently object to the admission of the same evidence at trial in order to
preserve error.  James v. State, 772 S.W.2d 84, 97 (Tex. Crim.
App.), vacated on other grounds, 493 U.S. 885 (1989).  However, when the
accused affirmatively asserts during trial that he has “no objection” to the
evidence, he waives any error in its admission.  Id.  Therefore, Weaver
waived any error in the trial court’s suppression ruling as to State’s exhibit
six and forfeited the right to complain about it on appeal.[5]

          Weaver
further asserts that his statements to the police should have been suppressed
because he requested to have an attorney present but was denied that right.  At
the suppression hearing, the trial court heard testimony from the interrogating
officers that Weaver did not make any requests for an attorney.  Additionally,
Weaver testified that he had requested an attorney during gaps in the recordings
and during a restroom break, that he did not think he had asked for an attorney
at one interview, and that he asked “towards the end” of another interview.  In
his written findings of fact and conclusions of law, the trial court stated
that it found the officers’ testimony to be credible and convincing and that Weaver’s
testimony was not.

          Because
the question turns entirely on the credibility of the witnesses, we defer to
the trial court’s findings of fact.  See Kelly, 204 S.W.3d at 818–19.  These
findings are dispositive of the legal ruling:  that Weaver did not invoke his
right to counsel at any point.  Id. at 818.  We overrule Weaver’s third
point.

IV.  Legal
Sufficiency

          In
his second point, Weaver argues that the evidence was legally insufficient to
prove that he committed felony murder or the underlying felony, injury to a
child.  Specifically, Weaver asserts that the State failed to prove that he was
responsible for D.W.’s death, rather than some third party, and that the State
failed to prove that he had the requisite culpable mental state required for
injury to a child.

A.  Standard
of Review

          In
our due-process review of the sufficiency of the evidence to support a conviction,
we view all of the evidence in the light most favorable to the prosecution to
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007).  The standard of review is the same for
direct and circumstantial evidence cases; circumstantial evidence is as
probative as direct evidence in establishing the guilt of an actor.  Clayton,
235 S.W.3d at 778; Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App.
2007).  In determining the sufficiency of the evidence to show an appellant’s
intent, and faced with a record that supports conflicting inferences, we “must
presume—even if it does not affirmatively appear in the record—that the trier
of fact resolved any such conflict in favor of the prosecution, and must defer
to that resolution.”  Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim.
App. 1991).  Juries may draw multiple reasonable inferences as long as each
inference is supported by the evidence presented at trial.  Hooper, 214
S.W.3d at 15.  The sufficiency of the evidence should be measured by the
elements of the offense as defined by the hypothetically correct jury charge
for the case, not the charge actually given.  Hardy v. State, 281 S.W.3d
414, 421 (Tex. Crim. App. 2009); Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997).  Such a charge is one that accurately sets out the law,
is authorized by the indictment, does not unnecessarily restrict the State’s
theories of liability, and adequately describes the particular offense for
which the defendant was tried.  Villarreal v. State, 286 S.W.3d 321, 327
(Tex. Crim. App.), cert. denied, 130 S. Ct. 515 (2009); Malik, 953
S.W.2d at 240.

B.  Applicable
Law

          A
person may be convicted of murder when “in the course of and in furtherance of
the commission or attempt [of a felony], . . . he commits or attempts to commit
an act clearly dangerous to human life that causes the death of an individual.”
 Tex. Penal Code Ann. § 19.02(b)(3) (West 2011).  Here, the underlying felony
is injury to a child.  A person commits the offense of injury to a child “if he
intentionally, knowingly, recklessly, or with criminal negligence, by act or
intentionally, knowingly, or recklessly by omission, causes to a child, . . . : 
(1)  serious bodily injury; (2) serious mental deficiency, impairment, or
injury; or (3)  bodily injury”.  Id.
§ 22.04(a) (West 2011).  Injury to a child is a result-oriented or “result of
conduct” crime.  Patterson v. State, 46 S.W.3d 294, 301 (Tex. App.—Fort
Worth 2001, no pet.).  That is, the culpable mental state relates not to the
nature of or circumstances surrounding the charged conduct, but to the result
of the defendant’s conduct.  Id. (citing Haggins v. State, 785
S.W.2d 827, 828 (Tex. Crim. App. 1990)); see also Alvarado v. State,
704 S.W.2d 36, 38–39 (Tex. Crim. App. 1985); Beggs v. State, 597 S.W.2d
375, 377 (Tex. Crim. App. [Panel Op.] 1980).  Put another way, the conduct must
be done with the required culpability to effect the result. Patterson,
46 S.W.3d at 301 (citing Alvarado, 704 S.W.2d at 39).

          Here,
the jury charge stated that Weaver 

commit[ted] or
attempt[ed] to commit a felony, to-wit: Injury to a Child, and in the course of
and in furtherance of the commission or attempt of said Injury to a Child
offense, the defendant committed or attempted to commit an act clearly
dangerous to human life, to-wit: by shaking [D.W]., by causing [D.W.] to strike
an unknown object, by striking [D.W.] with an unknown object, by repeatedly
pouring water in [D.W.’s] mouth or by submersing [D.W.] in water that caused
the death of [D.W].[[6]]

 

C.  Evidence at Trial

          1. Creagh’s
Testimony

          Creagh
testified that on June 13, 2009, she recanted the rape and kidnapping story and
told police that she left D.W. with Weaver when she went to work on June 8,
2009; that when Weaver picked her up from work later that day, D.W. was not
with him; that when they arrived at the Denton County apartment, D.W. was lying
on the floor under a red towel, naked and covered with bruises; that D.W. was
limp and not breathing; and that Weaver would not allow Creagh to call 911.  She
said that after Weaver’s attempts to revive D.W. failed, they put D.W. in a car
seat in the back seat of Weaver’s car and drove around to find a place to
dispose of D.W.’s body.  When Weaver and Creagh determined that they did not
have enough gas to get to Lake Lewisville, they returned to their apartment,
left D.W.’s body in the car, and went to bed.

          Creagh
said that the next day, with D.W.’s body in the back seat of the car and
beginning to smell, Weaver took Creagh to work at 2:30 p.m. and told her to
obtain a daily bonus sufficient to pay for enough gas to get to Lake Lewisville.
 She said that Weaver, still with D.W.’s body in the car, picked Creagh up from
work around 9:00 p.m., purchased gas with a ten-dollar bonus Creagh had earned,
and headed to Lake Lewisville to dispose of D.W.’s body.  On the way to the lake,
Creagh recalled Weaver asking a police officer for directions.  She also said
that Weaver stopped at a construction site to pick up a sandbag that he later tied
to D.W.’s leg before dropping her body into the water.  Creagh said the couple
then went to the Dallas County apartment where they staged the story about the
attempted rape and kidnapping.  To make the story more believable, Creagh said
that Weaver stretched her clothes, pulled her hair, and hit her in the face.

          Creagh
said that she cooperated with Weaver because she was afraid of him.  During her
testimony, the State introduced Creagh’s timeslips from her job showing when she
worked on June 8, 2009, and June 9, 2009.[7]  Also during Creagh’s
testimony, the State published to the jury the June 10, 2009 recording of
Weaver and Creagh in the police interview room showing Weaver’s displeasure at
Creagh’s signing consent-to-search forms.

          2. 
Dallas Police Detective Emilio Henry’s Testimony

 

          Detective
Henry testified that he was involved from the beginning of the investigation
and that he interviewed Creagh and Weaver early in the morning on June 10,
2009.  He stated that Weaver remained steadfast in the rape and kidnapping
story.  He confirmed that Creagh had signed consent forms allowing police to
search the couple’s Denton County apartment and that when Weaver learned of
Creagh’s consent, Weaver became visibly angry with her and stated, “You didn’t
have to sign shit.  You know there’s blood in the baby’s bed.”[8]

          Detective
Henry said that on June 13, 2009, after speaking with Creagh, the course of the
investigation changed from rape and kidnapping to tampering with evidence and
murder.  He stated that on June 13, 2009, he also spoke with Weaver, who had
been arrested and was being held on an unrelated traffic warrant, and that
after Weaver waived his rights, Weaver admitted that the rape and kidnapping
story was not true.

          Detective
Henry testified that he next spoke with Weaver at Weaver’s request on July 2,
2009, at the Denton County jail.  Detective Henry then recited the events depicted
in State’s exhibit nine, a recording of his last interview with Weaver that was
published to the jury at the end of the Detective’s testimony, which we detail
below.  He concluded by confirming that on July 3, 2009, Weaver took the detectives
to the construction site where he had obtained the sandbag used to weigh down D.W.’s
body and to the location on the bridge where he dropped D.W.’s body into Lake
Lewisville.

          3.  State’s
Exhibit Nine:  Recording of Weaver’s July 2, 2009 Interview[9]

          On
July 2, 2009, at Weaver’s request, Detectives Henry, Lopez, and Foreman met
with Weaver at the Denton County jail.  After waiving his rights, Weaver first
told the officers that D.W.’s neck had swollen after she had eaten
an orange and that although she had trouble swallowing, he did not take her to
the doctor.  He then said that he had D.W. with him when he picked up Creagh
from work on June 9, 2009, and that after he went to the North Dallas
apartment, he put the baby carrier down on the floor, flipped open the top,
noticed that D.W. was not breathing, and performed CPR.

          Weaver
later admitted that on June 9, 2009, while bathing D.W., he had poured six to
eight cups of water on her head to rinse the soap out of her hair, and that she
had choked on the water.  He said that D.W. seemed lifeless as he dried her and
put her diaper on, that her eyes looked like she was falling asleep, that he
did not feel her move when he was doing her hair, and that he left her on a
towel on the floor.  He admitted that D.W. died two hours before he picked
Creagh up from work and that he and Creagh left D.W.’s body in the car
overnight.  He confirmed that he had asked a neighbor about a lake, that he had
stopped at a construction site to pick up a sandbag to weigh D.W.’s body down,
and that he had talked to a police officer before he and Creagh had disposed of
D.W.’s body in Lake Lewisville.  Weaver then offered to show the detectives
where he had dumped D.W.’s body into the lake.  At the conclusion of the
interview, Weaver confirmed that he had asked to speak to the detectives and that
he did so voluntarily.

          4.  Additional
Prosecution Witnesses’ Testimonies

          Dr.
Matthew Cox, a board-certified pediatrician, testified that the vast majority
of infant drownings are accidental and result from neglectful supervision, such
as “children left unsupervised in a bath tub who have become submerged and
can’t protect themselves.”  He also said that based on his experience and
training, physical signs that a child was drowning would include a “struggle,
trying to breathe . . . gasping for breath, moving around. . . . [C]hoking
noises.”  He also testified that appropriately performed CPR would leave at
most small bruises over the breast bone, but no bruising on the child’s face or
stomach.

          Search
One Rescue Team Member Paul Lake testified that two dogs trained to detect
human remains independently alerted on Weaver’s car.  Hickory Creek Police
Officer Jason Stevens testified that on June 9, 2009, he observed Weaver run a
stop sign but said that before he could pull Weaver over, Weaver pulled over
alongside his marked patrol car, indicated that he was trying to get to a
hospital and asked Stevens for directions to Lewisville.  Stevens said he
directed Weaver to Interstate Highway 35—a route that included a bridge across
Lake Lewisville.  Dallas County Crime Lab Analysts Christi Wells and Angela
Fitzwater testified that the items collected from Creagh and Weaver’s apartment
tested positive for human blood and that based on DNA analysis, there was a one
in 3.42 trillion chance that Weaver and Creagh were not the biological parents
of the person whose blood was on the collected items.  Dallas Crime Scene Detective
Will Vick testified that he found sand on the front passenger floorboard of
Weaver’s car.

          All
Nations Fellowship Church Pastor Robert Cannady, Creagh’s pastor, testified
that on June 12, 2009, Creagh told him what had happened to D.W. and that he
advised her to contact an attorney and to tell the police the truth.  Tammy
Creagh, Creagh’s aunt, and Pamara Childress, Creagh’s mother, both testified
that on the night of the alleged rape and kidnapping, Weaver did not appear
distraught about D.W.’s disappearance.  Harold Hall, Weaver and Creagh’s Denton
County neighbor, testified that about 3:30 p.m. on June 9, 2009, Weaver asked
him about lakes in the area, and he told Weaver that Lake Lewisville was close
by.

          Bryan
Perry, Weaver’s childhood friend who was called by the prosecution, testified
on cross-examination that he had never seen Weaver physically hurt Creagh but
that he had witnessed Creagh attack Weaver.

5. 
Weaver’s Testimony

          Weaver
testified that he was D.W.’s primary caregiver, that Creagh was with D.W. when
she stopped breathing, and that because Creagh feared she would go to jail, she
insisted that they hide the body.  He said that the couple drove to Lake
Lewisville the night of D.W.’s death but that he convinced Creagh not to drop D.W.’s
body in.  He also said that he took Creagh back to their apartment, left for a while,
and returned to find that Creagh had called 911 with the kidnapping story that
she had made up.

          During
cross-examination, Weaver admitted that he had lied to the police and that he
had told police several versions of the events.  He also admitted that he told
police that D.W. had drowned and that he had thrown D.W.’s body into Lake
Lewisville.

D.  Analysis

1.  Proof
of Identity

          Weaver
argues that no direct evidence proves that he was the guilty party.[10] 
The State relied extensively on circumstantial evidence, but circumstantial
evidence can be as probative as direct evidence.  Clayton, 235 S.W.3d at
778; Hooper, 214 S.W.3d at 13.  As we have detailed above, the record is
replete with Weaver’s admissions, attempts to conceal incriminating evidence, inconsistent
statements, and implausible explanations, which are all probative of guilt.  See
Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).  These not
only tend to prove that the crime occurred, but also tend to point specifically
to Weaver as the guilty party. See id.  Although Weaver’s
extrajudicial admissions do not amount to a full confession, they do permit a
reasonable inference of his guilt.  The jury was free to draw multiple
reasonable inferences from Weaver’s conflicting admissions.  See Zavala v.
State, 956 S.W.2d 715, 722 (Tex. App.—Corpus Christi 1997, no pet.) (“Given
the number of times appellant changed her story, we conclude that a jury could
have found . . . that she committed the crimes of her own
volition.”).

          Because
we must presume that the factfinder resolved any conflicting inferences against
Weaver and defer to that resolution, we hold that a rational factfinder could
have believed that Weaver was the guilty party beyond a reasonable doubt.  See
Matson, 819 S.W.2d at 846.

2.  Proof of Culpable Mental
State

          Weaver
points out that the State did not present any direct evidence of a culpable
mental state as an element of injury to a child.[11]
 However, mental state may be inferred from circumstantial evidence such as
acts, words, and conduct.  Guevara, 152 S.W.3d at 50.  In injury to a
child cases, there is rarely direct evidence of exactly how the injuries
occurred, which is why the culpable mental state may be inferred from
circumstantial evidence.  Williams v. State, 294 S.W.3d 674, 683 (Tex.
App.—Houston [1st Dist.] 2009, pet. ref’d).

          The
evidence supports the reasonable inference that Weaver acted with one of the culpable
mental states alleged in the indictment and set out in the jury charge.  First,
there was testimony that Weaver prevented Creagh from calling 911 when she
found D.W.’s body.  A reasonable juror could infer that this showed a
consciousness of guilt and that, therefore, D.W.’s death was not caused by a
mere accident, but rather by an intentional, knowing, reckless, or criminally negligent
act.  See Tex. Penal Code Ann. § 6.03 (West 2011); Fuentes v.
State, 880 S.W.2d 857, 860–61 (Tex. App.—Amarillo 1994, pet. ref’d) (stating
that the jury could infer that defendant acted intentionally or knowingly by
omission when he failed to seek medical care when he thought baby’s arm was
broken).

          A
similar inference could be drawn from the false kidnapping story.  Weaver’s
efforts to conceal D.W.’s body strongly imply a consciousness of guilt.  So,
too, does Weaver’s angry outburst when Creagh told him she had signed the consent-to-search
forms.  We defer to the factfinder’s resolution of any conflicting inferences. 
See Matson, 819 S.W.2d at 846.  There was sufficient evidence for
the jury to reasonably infer that Weaver acted with one of the alleged mental
states.  See Guevara, 152 S.W.3d at 50; Haggins, 785 S.W.2d at
827.

          Based
on the evidence set out above, we conclude that a rational trier of fact could
have found each element of injury to a child and of felony murder beyond a
reasonable doubt.  We overrule Weaver’s second point.

V. 
Accomplice Testimony

          In
his first point, Weaver contends that his conviction was improperly based on
accomplice testimony.

A.  Standard of Review

          Article
38.14 of the code of criminal procedure provides that

[a] conviction cannot
be had upon the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.

 

Tex.
Code Crim. Proc. Ann. art. 38.14 (West 2005).

          When
evaluating the sufficiency of corroboration evidence under the
accomplice-witness rule, we “eliminate the accomplice testimony from
consideration and then examine the remaining portions of the record to see if
there is any evidence that tends to connect the accused with the commission of
the crime.”  Malone v. State, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)
(quoting Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)).  To
meet the requirements of the rule, the corroborating evidence need not prove
the defendant’s guilt beyond a reasonable doubt by itself.  Malone, 253
S.W.3d at 257; Trevino v. State, 991 S.W.2d 849, 851 (Tex. Crim. App.
1999); Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994).  Nor is
it necessary for the corroborating evidence to directly link the accused to the
commission of the offense.  Cathey v. State, 992 S.W.2d 460, 462 (Tex.
Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).  Rather, the
evidence must simply link the accused in some way to the commission of the
crime and show that “rational jurors could conclude that this evidence
sufficiently tended to connect [the accused] to the offense.”  Simmons v.
State, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009).

          There
is no set amount of nonaccomplice corroboration evidence that is required for
sufficiency purposes; “[e]ach case must be judged on its own facts.”  Malone,
253 S.W.3d at 257 (quoting Gill, 873 S.W.2d at 48).  Circumstances that
are apparently insignificant may constitute sufficient evidence of
corroboration.  Trevino, 991 S.W.2d at 852.

          Additionally,
“[p]roof that the accused was at or near the scene of the crime at or about the
time of its commission, when coupled with other suspicious circumstances, may
tend to connect the accused to the crime so as to furnish sufficient
corroboration to support a conviction.”  Malone, 253 S.W.3d at 257
(quoting Brown v. State, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). 
But “mere presence alone of a defendant at the scene of a crime is insufficient
to corroborate accomplice testimony.”  Id. (quoting Golden v. State,
851 S.W.2d 291, 294 (Tex. Crim. App. 1993)).

          The
accomplice-witness rule is a statutorily imposed sufficiency review and is not
derived from federal or state constitutional principles that define the legal
sufficiency standards.  Cathey, 992 S.W.2d at 462–63.

B.  Analysis

          The
record contains significant nonaccomplice evidence tending to connect Weaver
with the crime, including Weaver’s own statements.  In State’s exhibit nine, Weaver
admitted that D.W. died while alone with him and that D.W. was not with him
when he picked Creagh up from work.  Weaver also admitted driving to the lake,
finding a sandbag to tie to D.W.’s body, and dropping D.W.’s body into the
water.  Weaver’s admissions corroborate Creagh’s accomplice testimony and tend
to connect Weaver with the crime.  See Malone, 253 S.W.3d at 257; see
also Cox v. State, 830 S.W.2d 609, 611–612 (Tex. Crim. App. 1992) (concluding
that appellant’s confession that he was at scene, combined with other
suspicious factors, was sufficient to corroborate accomplice testimony); Farris
v. State, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990) (noting that a
defendant’s confession that is not dependent upon accomplice testimony for
proof may be sufficient to corroborate accomplice testimony), overruled on
other grounds by Riley v. State, 889 S.W.2d 290, 300 (Tex. Crim. App.
1994); Jackson v. State, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974) (“It
is well established that appellant’s admission . . . , under most
circumstances, will be sufficient to corroborate the accomplice witness.”)

          Additionally,
Weaver’s admissions were not the only nonaccomplice evidence.  Hall testified
that on the afternoon of June 9, 2009, while Creagh was still at work, Weaver
asked him if he knew “where any good lakes were,” and that he directed Weaver
to Lake Lewisville.  Officer Stevens testified that he encountered Weaver near
Lake Lewisville at the relevant time.  Cadaver search dogs alerted on Weaver’s
car, sand was found on the car’s floor, and D.W.’s blood (identified by DNA
testing) was found on several items taken from the Denton County apartment and
on two blankets found in a nearby dumpster.  Additionally, Creagh’s timesheets
from her job corroborated that she was away from the apartment at the critical
time.  All this evidence tends not only to show that an offense was committed
but also to connect Weaver to the offense.  See Tex. Code Crim. Proc.
Ann. art. 38.14; Carillo v. State, 566 S.W.2d 902, 908 (Tex. Crim. App.
1978) (holding that sufficient evidence “meshe[d] perfectly” with accomplice
testimony).

          The
above non-accomplice corroborating evidence need not have been sufficient to
prove guilt beyond a reasonable doubt.  Simmons, 282 S.W.3d at 508.  It
was, however, sufficient for a rational jury to have concluded that the
corroborating evidence tended to connect Weaver to the murder.  See id.;
Cathey, 992 S.W.2d at 462.  We overrule Weaver’s first point.

VI.  Mistrial

          In
his fourth point, Weaver contends that the trial court abused its discretion by
denying his motion for a mistrial following a question about Weaver hitting
Creagh.

          We
review a trial court’s denial of a motion for mistrial for an abuse of discretion.
 Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), cert.
denied, 542 U.S. 905 (2004); Wood v. State, 18 S.W.3d 642, 648 (Tex.
Crim. App. 2000).

          Mistrial
is appropriate for only “highly prejudicial and incurable errors,” and the
trial court is required to grant a motion for a mistrial only when the improper
evidence is “clearly prejudicial to the defendant and is of such character as
to suggest the impossibility of withdrawing the impression produced on the
minds of the jurors.”  See Simpson, 119 S.W.3d at 272; Wood,
18 S.W.3d at 648; see also Hawkins v. State, 135 S.W.3d 72, 77 (Tex.
Crim. App. 2004) (stating that a motion for mistrial will be granted only in
“extreme circumstances, where the prejudice is incurable”).  When an improper
question is not answered, an instruction to disregard will usually render any
error harmless.  Turner v. State, 719 S.W.2d 190, 194 (Tex. Crim. App. 1986).

          Weaver’s issue is based on the
following exchange:

 

Q. [State]                        Did
you ever see the picture of [Creagh] in the hospital where she had the cut on
the inside of her mouth?

 

A. [Detective Foreman]    I
didn’t see the picture, no.

 

Q. [State]                        Well,
if she had a cut on the inside of her mouth, that might be evidence that
someone hit her, though?

 

[Defense]:                       Objection,
Your Honor.  Assuming facts not in evidence.

 

The Court:                       Sustained.

 

[Defense]:                       Ask
the Court to instruct the jury to disregard.

 

The Court:                      Ladies
and gentlemen, you’ll disregard the last question.

 

[Defense]:                       Move
for a mistrial, Your Honor.

 

The Court:                       Denied.

 

          We
note first that the objected-to question was not answered, so the trial court’s
instruction to disregard rendered any error harmless unless it was clearly
prejudicial or of such a character that its impression could not be withdrawn. 
See id.  We further note that before this exchange, the photograph in
question had already been admitted into evidence without objection and that Creagh
had testified, also without objection, that she received the cut depicted when
Weaver hit her to substantiate the attempted rape story.  In addition, Creagh
later testified, in response to defense counsel’s questions, to numerous
beatings by Weaver.  See Leday v. State, 983 S.W.2d 713, 718 (Tex. Crim.
App. 1998) (holding that no error occurred “when other such evidence was
received without objection, either before or after the complained-of ruling”). 
Under these circumstances, the unanswered question was neither clearly
prejudicial nor impossible to disregard.  As a result, the trial court did not abuse
its discretion in denying the motion for a mistrial.  We overrule Weaver’s
fourth point.

VII.
 Conclusion

          Having
overruled each of Weaver’s points, we affirm the trial court’s judgment.

 

 

BOB MCCOY
JUSTICE

 

PANEL:
 WALKER, MCCOY, and MEIER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED:  September 15,
2011









          [1]See Tex. R. App. P. 47.4.





[2]At the time of D.W.’s
death, Weaver and Creagh were moving from an apartment complex in North Dallas
to an apartment in Denton County.  The 911 call reporting D.W.’s kidnapping
originated from the couple’s North Dallas apartment.





[3]Because Weaver challenges
the sufficiency of the evidence to uphold his conviction, we set out the
evidence in detail below.





[4]The record does not
contain a copy of Weaver’s written motion.





[5]Even if the issue had been
preserved, Weaver does not suggest that he was in custody or that there was any
questioning by law enforcement officers when the statements on this recording
were made.  Miranda only applies to custodial interrogations.  Miranda,
384 U.S. at 467, 86 S. Ct. at 1624 (“[T]he process of in-custody interrogation
of persons suspected or accused of crime contains inherently compelling
pressures . . . .”).  Weaver also argues that these statements should have been
suppressed because he was unaware that he was being recorded.  However, the law
does not require that he be so informed.  See, e.g., Tex. Code Crim.
Proc. Ann. art. 38.22 (West 2005); Moore v. State, 882 S.W.2d 844, 846
(Tex. Crim. App. 1994), cert. denied, 513 U.S. 1114 (1995).

 





[6]Weaver does not challenge
any part of the trial court’s charge to the jury.





[7]Although Creagh testified
that she worked from 2 p.m. to 9 p.m. on June 8 and from 3 p.m. to 9 p.m. on
June 9, her timesheet reflects that she actually worked from 3 p.m. to 9 p.m.
on June 8 , and from 2 p.m. to 9 p.m. on June 9.





[8]In addition to recording
Weaver and Creagh in the interview room, the officers observed them “live” via
closed-circuit monitors.





[9]Although all of Weaver’s
recorded pretrial statements were admitted into evidence, only the recording of
his July 2, 2009 statement was published to the jury.





[10]Weaver suggests various
alternate hypotheses consistent with the evidence.  However, the alternate
reasonable hypothesis theory does not apply to a legal sufficiency review.  Wilson
v. State, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999).





[11]The felony murder rule
dispenses with the necessity of proving mens rea accompanying the homicide
itself; the underlying felony supplies the culpable mental state.  See
generally Flores v. State, 102 S.W.3d 328, 330 (Tex. App.—Eastland 2003,
pet. ref’d) (citing Johnson v. State, 4 S.W.3d 254, 255 (Tex. Crim.
App.1999)).